[No. C041897. Third Dist. Oct. 1, 2004.]

COALITION FOR REASONABLE REGULATION OF NATURALLY OCCURRING SUBSTANCES et al., Plaintiffs and Appellants, v. CALIFORNIA AIR RESOURCES BOARD et al., Defendants and Respondents.

COUNSEL

Diepenbrock Law Firm, Mark D. Harrison and Gene K. Cheever for Plaintiffs and Appellants.

Mark S. Rentz for California Forestry Association and California Manufacturers and Technology Association as Amici Curiae on behalf of Plaintiffs and Appellants.

Nick Cammarota for California Building Industry Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, and Ralph J. Venturino, Deputy Attorney General, for Defendants and Respondents.

OPINION

**BLEASE, Acting P. J.**—This is an appeal from a judgment which upheld an Air Resources Board (Board) regulation that barred the sale and supply of rock which contains asbestos for the surfacing of unpaved roads.

The plaintiffs, mining and construction industry groups, challenge the Board's compliance with the Tanner Act (Health & Saf. Code, § 39650 et seq.) and with the California Environmental Quality Act (CEQA).[1]

The Tanner Act provides for the identification and regulation of toxic air contaminants by airborne toxic control measures (called an ATCM). The Board is the state agency primarily responsible for implementation of the Act. It has identified asbestos as a toxic air contaminant that has no safe level of exposure for human health. (Cal. Code Regs., tit. 17, § 93000; hereafter Regulations, section 93000.) The Act authorizes the Board "to reduce emissions [of toxic air contaminants] to the lowest level achievable through application of [the] best available control technology . . . ." (§ 39666, subd. (c).)

The Board exercised this authority in adopting the 2000 ATCM. It reduces from 5 percent to less than 0.25 percent (the minimum detectable level) the amount of naturally occurring asbestos in rock that can be used to surface unpaved roads. (Cal. Code Regs., tit. 17, § 93106; hereafter Regulations,

---

[1] A reference to a section is to the Health and Safety Code unless otherwise designated.

section 93106.)[2] It is based on the view that vehicles traversing rock containing asbestos release asbestos fibers into the air.

The Tanner Act requires that before adopting an ATCM the Board must consider a report, called an Initial Statement of Reasons (ISOR). (§ 39666, subd. (c).) The report must address "the need and appropriate degree of regulation" of the toxic air contaminant and contain data on specified issues "to the extent data can reasonably be made available . . . ." (§ 39665, subds. (a) & (b).) The 2000 ISOR provided data in support of a regulation prohibiting the use of rock containing asbestos to surface future unpaved roads and the proposal was adopted in substance in the 2000 ATCM. The technology employed is a simple and inexpensive test for the asbestos content of the rock.

The plaintiffs challenge the validity of the 2000 ISOR and hence the validity of the 2000 ATCM. They do not challenge the facts in the 2000 ISOR nor their sufficiency to support the 2000 ATCM. They claim that factual sufficiency is not the measure of the ISOR's validity. Rather, they claim the 2000 ISOR is invalid because it does not address the issues mandated by section 39665, subdivision (b), in that (1) it does not contain reasonably available data on the emissions of asbestos from existing unpaved roads, or (2) on the quarries that provide rock for surfacing unpaved roads, or (3) data which justifies extension of the asbestos-content restriction to ultramafic rock, and, further, (4) that it violates CEQA.[3]

Because of these perceived defects plaintiffs sought a declaration that the Board violated section 39665, and hence section 39666, and a writ of mandate and injunction to rescind the 2000 ATCM.

The trial court rejected plaintiffs' challenge. This appeal followed.

We disagree with the plaintiffs' challenge to the 2000 ISOR. They have severed the ISOR from its role in the design of an ATCM. The ISOR must address only those issues relevant to the ATCM which is adopted. Since the 2000 ATCM only regulates emissions from rock used to surface or resurface future unpaved roads it need not contain data on emissions from existing roads. For this and other reasons we shall affirm the judgment because the undisputed facts show the need for and appropriateness of the 2000 ATCM.

---

[2] Such rock is called serpentine rock and is found, among other places, in ultramafic rock formations.

[3] The plaintiffs also claim the trial court erred by refusing to take judicial notice of other Board decisions as evidence of the Board's interpretation of its duties under the Tanner Act. We later discuss and reject this claim.

## I

## THE REGULATION

### A.

### The 2000 ATCM

The 2000 ATCM prohibits the sale or supply of "restricted material" for the surfacing of unpaved roads "unless it has been tested . . . and determined to have an asbestos content that is less than 0.25 percent." (Regs., § 93106, subd. (c).) The previous ATCM (the 1990 ATCM) was limited to "serpentine material that ha[d] an asbestos content greater than five percent . . . ." (former § 93106, subd. (a)(5).) The 2000 ATCM defines " '[r]estricted material' " as rock "extracted from property where any portion . . . is located in a geographic ultramafic rock unit," a favorable geologic environment for the occurrence of asbestos-bearing rock. (§ 93106, subd. (i)(20).)[4]

The plaintiffs do not challenge the Attorney General's assertion that 0.25 percent is the "detection limit" for asbestos in rock or that the test for asbestos costs less than 10 cents per ton, nor do they challenge the overall costs of the 2000 ATCM.

### B.

### The 2000 ISOR[5]

The 2000 ISOR states that since the adoption of the 1990 ATCM, air monitoring studies and dust emission models have disclosed health risks from unpaved roads even where the asbestos content of the surface is less than 1 percent. It offered this information as support for an amendment to the 1990 ATCM to prohibit the use of all serpentine material for future surfacing applications. It also proposed expanding the prohibitions to all ultramafic rock that contained 0.25 percent asbestos.

The 2000 ISOR stated: "[I]t is difficult to make quantitative assessments of the emissions and risk from unpaved surfaces. There are many factors that

---

[4] If the rock is not restricted, no test is required unless the material has been evaluated at the request of an air pollution control officer.

[5] As noted, the plaintiffs do not challenge the facts in the ISOR. Accordingly, they must accept as fact the results of the tests which are set forth therein. We set forth only those facts sufficient to sustain the 2000 ATCM.

The request of amicus curiae to take judicial notice of documents on the Board's Web site is denied.

influence the release of the asbestos fibers. Some of these factors that influence asbestos emissions include vehicular activity patterns, asbestos content of the material, seasonal variations, the physical characteristics of the surface, and meteorological conditions. However, it is reasonable to assume that if there is asbestos in the aggregate and vehicles drive over the material and break it up, asbestos will be released into the air. Therefore, eliminating asbestos in the material used for new surfacing applications will reduce exposures."

The assumption that vehicles traveling over rock containing more than 0.25 percent asbestos will release asbestos fibers into the air is supported by the data adduced in the 2000 ISOR.

In conjunction with a task force investigation in 1998, the Board staff conducted an airborne asbestos monitoring program, sampling at over 60 sites in El Dorado, Placer, and Nevada Counties. It demonstrated there was a consistent pattern of elevated asbestos levels occurring near potential sources of asbestos, such as unpaved serpentine roads, serpentine quarries, and construction sites. As to these, staff wrote: "The air monitoring results show individual asbestos levels ranging from below the [minimum detection level] to 0.169 fibers/cc at the entrance to an active serpentine quarry. [¶] Near these potential sources, the associated average cancer risk is typically between 10 and 50 chances in a million. However, the average concentration at one site near the entrance to a serpentine quarry was 0.05 fibers/cc. At that level, the average mesothelioma risk is estimated to be about 300 chances in a million."

The increased levels of asbestos concentrations near potential sources of asbestos led staff to investigate further the asbestos emissions and associated risks from unpaved roads covered with serpentine. The ISOR discussed six road studies conducted in California since 1992 to measure airborne asbestos concentrations near unpaved serpentine roads.

Two of the studies, one performed for the Sacramento Bee in 1998 and another performed by Board staff on sites near Weaverville in 1999, did not disclose the asbestos content of the road material being tested. Two other studies, one performed by the Environmental Protection Agency (EPA) in 1994 on serpentine roads in a residential development known as Diamond XX near Copperopolis, California, and another performed by Board staff in 1992 on serpentine roads near Oakdale, California, evaluated emissions from unpaved roads with asbestos contents of 9 and 16 percent respectively. All four of these studies documented increased levels of asbestos concentrations due to traffic passing over the serpentine roads.

A fifth study performed by Board staff in 1999 evaluated airborne asbestos concentrations from a paved street near Foresthill with potholes exposing the

serpentine road base. The exposed serpentine road base was determined to have an asbestos content of 0.2 percent or less than that regulated under the 2000 ATCM. Asbestos samplers were placed at three sites along the road adjacent to potholes. Three eight-hour samples were taken at each site over the course of four days.

At the first site, asbestos concentration measured between 0.0054 and 0.0214 asbestos structures per cubic centimeter of air. Asbestos concentration at the second site measured between 0.0027 and 0.0150 asbestos structures per cubic centimeter, and at the third site, 0.0009 and 0.0017 asbestos structures per cubic centimeter.

Staff used the cancer unit-risk factors developed by the Department of Health Services (DHS) in 1986 and used by the Board in the 1990 ATCM to estimate the risk of persons contracting lung cancer and mesothelioma following long-term continuous exposure to the concentrations found in the road study. However, instead of using DHS's best estimated value as it did for the 1990 ATCM, staff used DHS's highest estimated value (also known as the highest confidence value). Using the highest estimated risk factor for a male smoker and female nonsmoker as the worst-case candidates for lung cancer and mesothelioma, respectively, staff concluded exposure to asbestos levels found in the pothole study resulted in 20 to 70 excess cases of lung cancer per million, and 30 to 130 cases of mesothelioma per million.

A sixth study, performed by Board staff in 1999, evaluated airborne asbestos concentrations from serpentine dust covering a paved road at the entrance to a quarry near Shingle Springs. This material was determined to have an asbestos content of between 0.0 and 0.75 percent, or an average of roughly 0.4 percent, again at or near the level regulated in the ATCM.

In this test, sampling was done on a 24-hour basis over 10 different days. At the site, asbestos concentrations ranged from a low of not being detected to a high of 0.0363 asbestos structures per cubic centimeter. Using the same highest estimated cancer risk factors discussed above, staff estimated continuous, long-term exposure to these levels of asbestos concentration resulted in 15 to 580 excess cases of lung cancer per million, and 20 to 1,000 cases of mesothelioma per million.

The 2000 ISOR also included an analysis obtained from computer models prepared by the EPA and the Board.

Of significance here, upon completing its computer model in 1992, the staff made the following conclusions:

"Although serpentine-covered unpaved roads indeed exist in many parts of California, nearly all unpaved roads covered with serpentine material on

public land are either unsurfaced roads or off-road-vehicle trails over native serpentine soil, or logging roads in mountainous, forested and often remote areas.

"Serpentine-covered unpaved roads in the vicinity of residences and centers of human activity suitable for field tests are common only in the Sierra Nevada foothills of California from approximately Mariposa County in the south to Placer County in the north.

"Traffic over serpentine-covered unpaved roads was found to generate measurably elevated levels of airborne asbestos at downwind distances to at least 250 feet."

Although the staff did not survey the emissions of asbestos from existing unpaved roads, this data shows that even small amounts of asbestos in rock used to surface unpaved roads pose a danger to human health by vehicles traveling over the rock.

II

STATUTORY BACKGROUND

A.

Scope of Review

The scope of review of a regulation that carries out the mandate of a statute is established by statute. We are directed to determine whether the regulation is "consistent [with] and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute." (Gov. Code, § 11342.2.)[6] Thus, we must determine whether the 2000 ATCM is within the substantive statutory authority granted the Board pursuant to section 39666 and whether the 2000 ISOR addresses the issues required by section 39665 that show the "need [for] and appropriate degree of regulation" of the 2000 ATCM.

---

[6] Government Code section 11342.2 provides that "[w]henever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless [1] consistent and not in conflict with the statute and [2] reasonably necessary to effectuate the purpose of the statute." (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 108–109 [126 Cal.Rptr.2d 441].)

The plaintiffs do not challenge the Board's substantive authority under section 39666, subdivision (c), to reduce the level of asbestos emissions from the future use of rock for the surfacing of unpaved roads to the lowest level achievable. Rather, they claim the Board failed to obtain and review reasonably available data on the issues specified by section 39665, subdivision (b), particularly subdivision (b)(1) and (3), regardless of its relevancy to the ATCM actually adopted. Since the plaintiffs do not dispute the facts, their argument reduces to the claim that the 2000 ISOR does not conform to the requirements of section 39665 viewed abstractly.

The plaintiffs have misread the Tanner Act.

## B.

### The Tanner Act

The Tanner Act was enacted in 1983 and establishes a system for the regulation of emissions of toxic substances into the air. (§§ 39650–39674; Stats. 1983, ch. 1047, § 1, pp. 3691–3702.)[7] It defines " 'toxic air contaminant' " as "an air pollutant which may cause or contribute to an increase in

---

[7] The Legislature has described the purposes and supporting policies of the Tanner Act in pertinent part as follows:

"The Legislature finds and declares the following: [¶] (a) That public health, safety, and welfare may be endangered by the emission into the ambient air of substances which are determined to be carcinogenic, teratogenic, mutagenic, or otherwise toxic or injurious to humans. [¶] . . . [¶]

"(c) That it is the public policy of the state that emissions of toxic air contaminants should be controlled to levels which prevent harm to the public health.

"(d) That the identification and regulation of toxic air contaminants should utilize the best available scientific evidence gathered from the public, private industry, the scientific community, and federal, state, and local agencies, and that the scientific research on which decisions related to health effects are based should be reviewed by a scientific review panel and members of the public.

"(e) That, while absolute and undisputed scientific evidence may not be available to determine the exact nature and extent of risk from toxic air contaminants, it is necessary to take action to protect public health.

"(f) That the state [Air Resources Board] has adopted regulations regarding the identification and control of toxic air contaminants, but that the statutory authority of the state board, the relationship of its proposed program to the activities of other agencies, and the role of scientific and public review of the regulations should be clarified by the Legislature. [¶] . . . [¶]

"(i) That the purpose of this chapter is to create a program which specifically addresses the evaluation and control of substances which may be toxic air contaminants and which complements existing authority to establish, achieve, and maintain ambient air quality standards. [¶] . . . [¶]

"(k) That a statewide program to control toxic air contaminants is necessary and desirable in order to provide technical and scientific assistance to the [local air] districts, to achieve the earliest practicable control of toxic air contaminants, to promote the development and use of advanced control technologies and alternative processes and materials, to identify the toxic air

mortality or in serious illness, or which may pose a present or potential hazard to human health." (§ 39655.)

The regulatory procedure is bifurcated into identification and control measures.

The identification of asbestos as a toxic air contaminant and its inherent danger to human health is not at issue in this case. The Board has determined there is no threshold level of exposure of asbestos below which no significant adverse health effects are anticipated and this means there is no safe level of exposure of human beings to airborne asbestos fibers. (Regs., § 93000.) The undisputed facts show that even small amounts of asbestos in rock used to surface unpaved roads pose a hazard to human health.

■ The control measures are governed by sections 39665 and 39666. A report must be prepared pursuant to section 39665 and a regulation adopted pursuant to section 39666. The report bears a defined relationship to the regulation. The purpose of the report is to provide data "on the need and appropriate degree of regulation" of the toxic air contaminant. (§ 39665, subd. (a).) The factors specified in the report (§ 39665, subd. (b)) must be considered by the Board in adopting the regulation. (§ 39666, subd. (c).) Accordingly, the validity of the ISOR is measured by its sufficiency to support the ATCM which is adopted.

By adoption of the 1990 ATCM, the Board determined that automobiles traveling over unpaved roads surfaced with rock containing asbestos release asbestos fibers into the air and thereby affect human health. As noted, the 2000 ISOR confirms this determination even for small amounts of asbestos. None of these findings is challenged by the plaintiffs. Accordingly, they provide the basis upon which the Board's compliance with the provisions of sections 39665 and 39666 may be assessed.

■ The issues which an ISOR must address in support of the ATCM are set forth in section 39665.[8] It is "a report on the need [for] and appropriate

---

contaminants of concern and determine the priorities of their control, and to minimize inconsistencies in protecting the public health in various areas of the state." (§ 39650.)

[8] Section 39665, subdivision (b), lists the issues to be addressed in the ISOR "to the extent data can reasonably be made available:

"(1) The rate and extent of present and anticipated future emissions, the estimated levels of human exposure, and the risks associated with those levels.

"(2) The stability, persistence, transformation products, dispersion potential, and other physical and chemical characteristics of the substance when present in the ambient air.

"(3) The categories, numbers, and relative contribution of present or anticipated sources of the substance, including mobile, industrial, agricultural, and natural sources.

degree of regulation for each substance which the state board has determined to be a toxic air contaminant." (§ 39665, subd. (a).) The substantive requirements of an ATCM are set forth in section 39666. Accordingly, the purpose of the report is to provide evidentiary justification for the ATCM that is adopted pursuant to section 39666. To that end the ISOR must address the issues specified in subdivision (b) of section 39665, "to the extent data can reasonably be made available," and such data must be considered by the Board in adopting an ATCM. (§ 39666, subd. (c).)

As applicable here, the Board's substantive authority is set out in subdivision (c), as follows:

"For toxic air contaminants for which the state board has not specified a threshold exposure level pursuant to Section 39662, the airborne toxic control measure [ATCM] shall be designed, in consideration of the factors specified in subdivision (b) of Section 39665, *to reduce emissions to the lowest level achievable through application of best available control technology or a more effective control method*, unless the state board . . . determines, based on an assessment of risk, that an alternative level of emission reduction is adequate or necessary to prevent an endangerment of public health." (Italics added.)

█ This provision authorizes, in fact directs, the Board to design an ATCM to reduce the emissions of asbestos fibers to zero if, considering the factors in section 39665, subdivision (b), it is achievable given the technology and costs of enforcement and the availability of substitute compounds of a less hazardous nature.

In this case the Board has determined that the best available control technology is a simple and inexpensive test of the asbestos content of rock taken from geological strata favorable to the occurrence of asbestos-bearing rock. The plaintiffs do not challenge this determination.

---

"(4) The availability and technological feasibility of airborne toxic control measures to reduce or eliminate emissions, the anticipated effect of airborne toxic control measures on levels of exposure, and the degree to which proposed airborne toxic control measures are compatible with, or applicable to, recent technological improvements or other actions which emitting sources have implemented or taken in the recent past to reduce emissions.

"(5) The approximate cost of each airborne toxic control measure, the magnitude of risks posed by the substances as reflected by the amount of emissions from the source or category of sources, and the reduction in risk which can be attributed to each airborne toxic control measure.

"(6) The availability, suitability, and relative efficacy of substitute compounds of a less hazardous nature.

"(7) The potential adverse health, safety, or environmental impacts that may occur as a result of implementation or an airborne toxic control measure.

"(8) The basis for the finding required by paragraph (3) of subdivision (b) of Section 39658, if applicable." (§ 39665, subd. (b).)

Since the Board is authorized to reduce the risk of asbestos emissions to zero, and has done so in the 2000 ATCM, it was unnecessary for it to exercise its discretion to assess the risk of "an *alternative* [or lower] level of emission reduction . . . adequate or necessary to prevent an endangerment of public health." (§ 39666, subd. (c), italics added.)[9]

Given the test chosen, that airborne asbestos has been identified as having no safe level for human health, and that vehicles traversing rock containing even small amounts of asbestos release asbestos fibers into the air, the Board has enacted a control technology which reduces the risks to the "lowest level achievable," to wit, zero. Consequently, the issue to be decided is whether the 2000 ISOR provides data which conform to the requirements of section 39665, subdivision (b), so as to justify the 2000 ATCM.

## III

## CONTENTIONS

### A.

The plaintiffs contend the 2000 ISOR is deficient because it needed to document the actual emissions and risks from existing roads containing such reduced asbestos contents. They base this claim on the provision of section 39665 requiring that the ISOR address "[t]he rate and extent of *present* and anticipated future emissions" of the toxic substance and the "relative contribution of present or anticipated sources of the substance . . . ." (§ 39665, subd. (b)(1) and (3), italics added.) The plaintiffs say that simply estimating the total number of serpentine-covered roads in the state without determining their asbestos content merely repeated what Board staff had already performed 10 years earlier in the 1990 ATCM and was inadequate to fulfill the requirements of section 39665.

█ The difficulty with the argument is that the 2000 ISOR does not seek to control the "present" emissions of asbestos from existing roads. Rather, the 2000 ATCM seeks to regulate the "anticipated future emissions" of asbestos on the view that as new rock is used to surface or resurface unpaved roads the emissions from that "source" will be zero. Had the Board sought to

---

[9] Subdivision (c), directs the reduction of harmful emissions "to the lowest level achievable" "*unless*" the Board "*determines*," otherwise. (Italics added.) The "unless" clause is a dependent clause; it provides for an "alternative," i.e., a higher level of risk, only if the "board [so] determines," in consideration of the factors in section 39665, that an "alternative level of emission reduction is adequate or necessary to prevent an endangerment of public health." This places the discretion to make that "determin[ation]" in the Board. These provisions have no application to this case since the Board made no such determination.

control the emissions of asbestos from existing roads, i.e., had the Board sought to regulate a different "source" of emissions, the plaintiffs' claims would have merit. Although the Board has discretion to consider alternative regulations it need not do so and the validity of the ISOR is to be measured by the ATCM actually adopted.

As noted, the Board has determined there is no level of airborne asbestos that is not dangerous to human health. (Regs., § 93000.) The record contains unchallenged evidence, taken from studies and an EPA model, of the risks to human health by the release of asbestos fibers from vehicles which traverse rocks that contain even small amounts of asbestos. This supports the Board's action in the 2000 ATCM to reduce the concentrations of asbestos in rock used to surface unpaved roads to zero.

## B.

The plaintiffs also argue that the 2000 ISOR fails to contain data required for the regulation of ultramafic rock, that "[t]he 2000 ISOR presented no data on the occurrences of asbestos in non-serpentine ultramafic rock," or in "quarries producing non-serpentine ultramafic rock for surfacing," and presented "no evidence on the asbestos emissions that are occurring from surfacing applications using non-serpentine ultramafic rock."

These claims make sense only as they relate to the 2000 ATCM's requirement that ultramafic rock be tested for asbestos, since that is the control technology employed, and to the costs that the tests engender.

We start with the last claim, concerning the lack of evidence of asbestos emissions from nonserpentine ultramafic rock. Since the 2000 ATCM does not regulate asbestos emissions from existing roads and prohibits only the future use of rock that has been tested and shown to contain asbestos, the only evidence that the 2000 ISOR need show concerns the dangers to human health from the use of surfacing rock containing asbestos. The record shows there are dangers from even small amounts of asbestos in rock used to surface unpaved roads. Since the plaintiffs do not dispute this evidence this claim lacks merit.

The remaining claims relate to the extension of the asbestos testing requirements to ultramafic rock. The plaintiffs seek to prevent the testing of ultramafic rock for asbestos presumably because it is not a prolific source of asbestos. ▉ The scope of the Board's authority to extend testing to ultramafic rock is measured by whether the data gathered are reasonably necessary to effectuate the purpose of the statute (Gov. Code, § 11342.2), i.e., reasonably necessary in the detection of asbestos in surfacing rock. "[I]n

considering whether the regulation is 'reasonably necessary,' . . . the court will deter to the agency's expertise and will not 'superimpose its own policy judgment upon the agency in the absence of an arbitrary and capricious decision.' [Citation.]" (*Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 411 [128 Cal.Rptr. 183, 546 P.2d 687].)

The 2000 ISOR explains that the "[m]etamorphism of ultramafic rocks usually results in the formation of the rock serpentine. Because metamorphism of ultramafic rocks to produce serpentine normally proceeds in successive steps rather than all at once, many ultramafic rocks will only be partially converted to serpentine when they are finally exposed at the surface of the earth. Asbestos may form at any time during the conversion of ultramafic rocks to serpentine if the physical and chemical conditions are right." Further, "[t]he occurrence of asbestos varies with different rock types and geologic conditions. In general, the vast majority of serpentine rock potentially contains asbestos. However, the occurrence of asbestos in ultramafic rock is variable. Ultramafic rock, especially in and around earthquake faults has a higher probability of containing asbestos. . . . [¶] Disturbances of serpentine or asbestos-containing ultramafic rock can cause asbestos fibers to be released into the ambient air when disturbed, crushed, or worn down by human activities or by the natural forces of weathering."

Thus the test of ultramafic rock for asbestos is based on the view that ultramafic rock itself may contain serpentine rock and that it may be difficult to tell whether ultramafic rock had metamorphosed into serpentine rock containing asbestos. Whether there is a little or a lot of asbestos in ultramafic geologic formations, the point of the ATCM test is to screen out the part that does contain asbestos. The means chosen, the test for asbestos, is "reasonably necessary" to that end.

■ The plaintiffs do not challenge these assertions. Nor does the 2000 ATCM prohibit the use of ultramafic rock for road surfacing that does not contain asbestos. Accordingly, the plaintiffs' objection must go to the cost of testing ultramafic rock and the costs of securing alternate surfacing materials. Yet, on this point they make no complaint that the costs exceed the benefits. As ultramafic rock is a candidate source for asbestos, the Board was justified in the extension of a test for asbestos to it.

■ The data that must be gathered pursuant to section 39665, subdivision (b), need not include matters which are immaterial to the exercise of the Board's authority under section 39666. Whatever the risk from existing unpaved roads the Board has determined there should be no added risk from the future surfacing of unpaved roads. The Board has also determined there is scientific reason to test ultramafic rock for asbestos. These conclusions are amply supported by the 2000 ISOR.

IV

CEQA

 The Board's regulatory program regarding the adoption and amendment of standards for the protection of ambient air quality has been certified by the Secretary as not requiring the preparation of EIR's. (Cal. Code Regs., tit. 14, § 15251, subd. (d).) That is because the Tanner Act itself seeks to protect the environment and provides its own measure for the accomplishment of that purpose. (*Ibid.*) The regulatory program documents "containing environmental information . . . may be submitted in lieu of the environmental impact report" required by CEQA. (Pub. Resources Code, § 21080.5, subd. (a).) Although some CEQA requirements still apply, none are at issue in this case. (See Pub. Resources Code, § 21080.5, subd. (c); *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215.)

To this end, staff reports such as an ISOR are to be prepared in a manner "consistent with the environmental protection purposes of the state board's regulatory program and with the goals and policies of the California Environmental Quality Act (CEQA)." (Cal. Code Regs., tit. 17, § 60005, subd. (b).) They must contain "a description of the proposed action, an assessment of anticipated significant long or short term adverse and beneficial environmental impacts associated with the proposed action and a succinct analysis of those impacts. The analysis shall address feasible mitigation measures and feasible alternatives to the proposed action which would substantially reduce any significant adverse impact identified." (*Ibid.*)

The only potential environmental impact identified by the ISOR that could occur from the implementation of the 2000 ATCM is the release of particulate matter into the air from diesel trucks carrying substitute materials for that prohibited by the ATCM. That is, the only additional environmental effect of the 2000 ATCM is that caused by the necessity (say) of transporting alternate materials from some *greater* distance. The ISOR concludes these effects are "extremely small but could constitute an adverse environmental impact . . . ." However, "any emission increases are expected to be short-term ones that will diminish over time . . . ." The plaintiffs do not challenge these findings.

 Rather, they complain that the 2000 ISOR did not analyze the impacts from 17 identified quarries. Whether or not this would have shown some environmental effect from the transportation of alternate materials is, according to the Attorney General, "too speculative for evaluation" and we agree. (Cal. Code Regs., tit. 14, § 15145.) The Board staff contacted all 17 quarries by phone and determined that only three were producing significant quantities of aggregate containing asbestos for road surfacing.

We conclude there is substantial evidence that the agency complied with its regulatory mandate.

## DISPOSITION

The judgment is affirmed.

Nicholson, J., and Raye, J., concurred.

A petition for a rehearing was denied October 29, 2004, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied January 12, 2005.