[Nos. A104076, A104077. First Dist., Div. Three. Mar. 9, 2005.]

JOHN GARAMENDI, as Insurance Commissioner, etc., Plaintiff, v. GOLDEN EAGLE INSURANCE COMPANY, Defendant and Respondent; PAULI SYSTEMS, INC., Claimant and Appellant.

## COUNSEL

Timothy D. Regan, Jr.; Mannion & Lowe, E. Gerard Mannion and Wesley M. Lowe for Claimant and Appellant.

Amy Bach; Stanzler Funderburk & Castellon and Jordan S. Stanzler for United Policyholders as Amicus Curiae on behalf of Claimant and Appellant.

Ault, Davis & Schonfeld, Richard P. Edwards and Corinne Coleman Bertsche for Defendant and Respondent.

## OPINION

**POLLAK, J.**—These are consolidated appeals by Pauli Systems, Inc. (claimant) from identical orders denying applications for orders to show cause in proceedings instituted by claimant against Golden Eagle Insurance Corporation as third party administrator for Golden Eagle Insurance Company (Golden Eagle).[1] The applications challenged Golden Eagle's denial of coverage for claims asserted by two groups of workers for "silica-related injuries and damages." The trial court concluded Golden Eagle properly rejected the tenders of defense based on the pollution exclusion contained in its commercial general liability policy. We agree.

---

[1] The procedural framework for Golden Eagle's conservation proceedings is described in *Low v. Golden Eagle Ins. Co.* (2002) 101 Cal.App.4th 1354, 1359 [125 Cal.Rptr.2d 155].

## Background

*The Underlying Complaints*

The two underlying complaints, both filed in circuit courts of Mississippi, contain the same charging allegations.[2] Both allege the plaintiffs "worked in, or were otherwise exposed to, silica at and throughout their employment" and "[f]or many years . . . were exposed to silica-containing dust and suffered serious and permanent bodily injuries as a result of their exposure to silica and silica dust." The complaints continue, "During their work life, [p]laintiffs were injured and damaged through the sale of silica-containing products, the use of defective respiratory equipment . . . , and the use of sandblasting equipment . . . and other devices necessary to carry out what is commonly known as 'sandblasting.' [¶] . . . During a sandblasting operation, silica-containing dust is created which includes particles that are invisible to the human eye, but which particles are inhaled by workers in a very large area surrounding the sandblasting operation. [¶] . . . This silica-containing dust does not fall to the ground but, in fact, is suspended in the air and travels over a large distance, subjecting many workers in the area to an unreasonable risk of harm."

The complaints name 49 defendants, including claimant Pauli Systems, who are collectively alleged to have "designed, tested, evaluated, manufactured, mined, packaged, furnished, supplied and/or sold abrasive blasting products, protective gear and equipment, safety equipment and/or sandblasting-related materials, equipment, products, etc." The complaints further allege the sellers of silica-containing products failed to provide adequate warnings of the health risks that "were reasonably forseeable or scientifically discoverable at the time of the exposure," and that "[d]efendants sold masks and respirators which were wholly inadequate and not approved for blasting operations with silica-containing products" and air-supplied hoods that "were defective by reason of their design, marketing, and their forseeable use or misuse." The complaints contain no allegations describing the nature of claimant's business or its particular activities or operations.

*The Golden Eagle Policy*

Golden Eagle issued claimant a commercial general liability insurance policy for the time period in question. The policy provides coverage for "those sums that the Insured becomes legally obligated to pay as damages

---

[2] The first action, *Glass v. Clark Sand Co.* (Jefferson County, No. 2002-93), was filed on behalf of 30 plaintiffs. The second, *Green v. Clark Sand Company* (Claiborne County, No. 2002-131), was filed on behalf of 17 plaintiffs. Amended complaints in both cases were filed in June 2002.

because of 'bodily injury' or 'property damage' to which this insurance applies." The pollution exclusion appearing as "Exclusion f." in the "Coverages" section of the policy was replaced by a "Total Pollution Exclusion Endorsement." This endorsement provides that the insurance does not apply to " 'Bodily injury' or 'property damage' which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time." Pollutants are defined in the endorsement as "any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. . . . "

*Tender and Denial of Defense and Filing Suit*

Claimant tendered the defense of both complaints to Golden Eagle after the liquidation proceedings had been commenced. Both tenders were rejected with the following explanation: "Plaintiff brings this action for injuries allegedly incurred as a result of exposure to silica and silica dust. We are denying coverage based upon, but not limited to the Total Pollution Exclusion on the Policies. The 'bodily injury' that is alleged to have resulted from the exposure to silica and silica dust is specifically precluded from coverage." Claimant thereafter filed two applications pursuant to Insurance Code section 1032[3] for orders to show cause why the claims should not be allowed. Following briefing, the applications were heard and denied on the ground the claims administrator had not abused its discretion in denying coverage. Plaintiffs filed timely notices of appeal.

### Discussion

█ "Because the insurer is in liquidation, the scope of our review of determinations of both the superior court and the liquidation trustees in the resolution of claims by insureds against an insolvent carrier is circumscribed. (See generally, Ins. Code, §§ 1010–1062.) Our high court has long since observed that such conservation proceedings arise under the broad police powers of the state to insure the reorganization or orderly liquidation of insolvent insurers and the protection of their policyholders and the public. [Citation.] A corollary of that broad power is the judiciary's limited scope of inquiry into the liquidation trustees' grounds for rejecting claims for compensation by policyholders. As the *Carpenter [v. Pacific Mut. Life Ins. Co.* (1937) 10 Cal.2d 307, 329 [74 P.2d 761]] court put the ruling standard, 'The only restriction on the exercise of this power [to administer liquidation proceedings under the Insurance Code] is that the state's action shall be reasonably

---

[3] Insurance Code section 1032 provides: "When a claim is rejected by the commissioner, written notice of rejection shall be given by mail . . . . Within thirty days after the mailing of the notice the claimant may apply to the court in which the liquidation proceeding is pending for an order to show cause why the claim should not be allowed."

related to the public interest and shall not be arbitrary or improperly discriminatory.' (*Ibid.*) [¶] That seminal formulation has since been glossed repeatedly to mean the measure of judicial review in such proceedings is the familiar 'abuse of discretion' standard." (*Low v. Golden Eagle Ins. Co.* (2002) 104 Cal.App.4th 306, 315–316 [128 Cal.Rptr.2d 423].) Our review of the liquidation court's factual determinations is likewise circumscribed. (*Low v. Golden Eagle Ins. Co.* (2003) 110 Cal.App.4th 1532, 1544 [2 Cal.Rptr.3d 761].)

▇ In *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635 [3 Cal.Rptr.3d 228, 73 P.3d 1205] (*MacKinnon*) our Supreme Court considered at length the derivation and interpretation of a pollution exclusion provision that defined pollution in essentially the same language as contained in claimant's Golden Eagle policy. Recognizing that the policy definition of a "pollutant" as including "any irritant or contaminant," read literally, leads to "absurd results and ignores the familiar connotations of the words used in the exclusion," the court felt it " 'far more reasonable that a policyholder would understand [a pollutant] as being limited to irritants and contaminants *commonly thought of as pollution* and not as applying to every possible irritant or contaminant imaginable.' " (*Id.* at pp. 652–653.) The court therefore limited the scope of the pollution exclusion "to injuries arising from events commonly thought of as pollution, i.e., environmental pollution." (*Id.* at p. 653.)

Applying this standard, the court in *MacKinnon* held that a landlord's allegedly negligent use of a pesticide by spraying to eradicate yellow jackets around its apartment building did not come within the scope of the pollution exclusion. The court found it "far from clear MacKinnon's claim . . . for injuries arising from the normal, though negligent, residential application of pesticides, would be commonly thought of as pollution. While pesticides may be pollutants under some circumstances, it is unlikely a reasonable policy-holder would think of the act of spraying pesticides under these circumstances as an act of pollution. . . . The normal application of pesticides around an apartment building in order to kill yellow jackets would not comport with the common understanding of the word 'pollute.' " (*MacKinnon, supra,* 31 Cal.4th at p. 654.)

▇ Claimant suggests silica is not a pollutant within the terms of the policy, since it is not "smoke, vapor, soot, fumes, acid, alkalis, chemicals [or] waste," and it is found in many commonplace materials such as sand, glass, concrete and computer chips. But even if silica is not one of the enumerated items listed in the policy definition of pollutants, that listing is not exclusive and silica dust nonetheless comes within the broad definition of "any solid,

liquid, gaseous, or thermal irritant or contaminant." Indeed, federal regulations identify silica dust as an air contaminant. (See 29 C.F.R. 1910.1000 (2004).) Claimant is correct that under *MacKinnon* the mere fact that silica, like almost anything else, may be an irritant or contaminant under some circumstances is not dispositive. But unlike the residential use of a pesticide for the purpose of killing insects, the widespread dissemination of silica dust as an incidental by-product of industrial sandblasting operations most assuredly is what is "commonly thought of as pollution" and "environmental pollution." (*MacKinnon, supra,* 31 Cal.4th at pp. 653–654; cf. *Park-Ohio Industries, Inc. v. Home Indem. Co.* (6th Cir. 1992) 975 F.2d 1215, 1219; *Hydro Systems, Inc. v. Continental Ins. Co.* (C.D.Cal. 1989) 717 F.Supp. 700, 702–703; *Madison Construction Co. v. Harleysville Mutual Ins. Co.* (1999) 557 Pa. 595, 606–608 [735 A.2d 100, 107].) Contrary to claimant's suggestion, there need not be "wholesale environmental degradation, such as occurred at, for example, Love Canal, or the Stringfellow Acid Pits" to constitute pollution.

Claimant contends there is a possibility of liability falling within the terms of the policy and outside the exclusion because the underlying complaints allege that the defendants are responsible for defective products, such as defective respirators and air-fed hoods, and that they are liable for having failed to properly warn of risks associated with the use of the products sold. Since the complaint refers to the defendants collectively and fails to provide any meaningful indication of the nature of claimant's business, and the record contains no other clue as to whether claimant engages in sandblasting operations or sells equipment used in such operations, we must assume the product liability claims might apply to claimant. Claimant argues that claims based on product defects or failures to warn are not within the scope of the exclusion, relying heavily on a law review article appearing in the Environmental Claims Journal. (Stanzler & Johnson, *Product Liability and Completed Operations Coverage: The Pollution Exclusion Does Not Apply* (1992) 4 Envtl. Claims J. 479.)[4] However, although this article argues that products and completed-operations liability are not within the scope of what "some insurance industry commentators have dubbed . . . as the 'absolute pollution exclusion' " (*id.* at p. 480), the exclusion that is addressed in the article is not the exclusion in claimant's Golden Eagle policy. To the contrary, the version of the exclusion discussed in the article is a 1985 revision to the standard-form comprehensive general liability policy exclusion (*id.* at p. 479; see *MacKinnon, supra,* 31 Cal.4th at p. 644) that was in all essential respects the same as Exclusion f. in the "Coverages" section of

---

[4] Golden Eagle objects to consideration of this article, which apparently was not brought to the attention of the superior court. However, we do not regard the content of the article as evidence, but consider it simply for whatever light it may shed on the proper interpretation of the policy language under governing legal principles.

claimant's policy that was replaced by a new endorsement, captioned "Total Pollution Exclusion Endorsement." The contrast between the language of the two versions makes clear that under the operative endorsement in claimant's policy, there is no coverage for any of the claims in the underlying complaints, even if the products liability claims apply to claimant.

Exclusion f. provided that the insurance did not apply to bodily injury arising out of the actual, alleged or threatened discharge or dispersal of pollutants "at or from any premises, site or location" owned, occupied by, rented or loaned to the insured, or used by or for the insured or others for handling or storage of waste, or on which the insured or any contractor on his behalf performed certain operations with pollutants.[5] The exclusion as it then read thus generally applied to pollution occurring at a particular location for which the insured was somehow responsible. (*Legarra v. Federated Mutual Ins. Co.* (1995) 35 Cal. App.4th 1472, 1480–1481 [42 Cal.Rptr.2d 101].) Under this language, liability arising from the sale of a defective product may have fallen outside the exclusion. However, as indicated above, the language in the applicable version of the exclusion is far broader. It applies to any

[5] The exclusion also applied to bodily injury arising out of the discharge of pollutants that were transported or handled by or for the insured or by anyone for whom the insured was legally responsible.

The superseded exclusion read in full as follows: "1) 'Bodily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants: [¶] a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any Insured; [¶] b) At or from any premises, site or location which is or was at any time used by or for any Insured or others for the handling, storage, disposal, processing or treatment of waste; [¶] c) Which are or were at any time transported, handled, stored treated, disposed of, or processed as waste by or for any Insured or any person or organization for whom you may be legally responsible; or [¶] d) At or from any premises, site or location on which any Insured or any contractors or subcontractors working directly or indirectly or any Insured's behalf are performing operations: [¶] (i) If the pollutants are brought on or to the premises, site or location in connection with such operations by such Insured, contractor or subcontractor; or [¶] (ii) If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants. [¶] Subparagraphs a) and d)(i) do not apply to 'bodily injury' or 'property damage' arising out of heat, smoke or fumes from a hostile fire. [¶] As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be. [¶] 2) Any loss, cost or expense arising out of any: [¶] a) Request, demand or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or [¶] b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants. [¶] Pollutants mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

bodily injury "which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal . . . of pollutants at any time." This language shifts the focus to injuries that would not have occurred "but for" the discharge of pollutants. Thus, even on the assumption that claimant's alleged liability is based on the sale of defective products that contributed to personal injuries caused by silica dust, the injuries would not have occurred but for the discharge of the pollutant. Absent some other provision in the policy excepting product liability claims from the exclusion, the exclusion applies. (Cf. *Park-Ohio Industries, Inc. v. Home Indemnity Co., supra,* 975 F.2d at p. 1223; *Madison Construction Co. v. Harleysville Mutual Ins. Co., supra,* 557 Pa. at pp. 610–612 [735 A.2d at pp. 109–110].)

■ Claimant next argues that because claimant's Golden Eagle policy also includes as an additional endorsement a specific exclusion for claims based on exposure to asbestos, another natural product like silica, a reasonable insured would understand that the pollution exclusion does not apply to claims for exposure to silica, for which there is no comparable explicit endorsement. We are not convinced. In light of the widespread asbestos litigation that has been ongoing for approximately a half-century, it is not surprising that an insurer seeking to exclude coverage for asbestos claims would include an explicit provision making that exclusion unmistakably clear. The effect of such prudence, however, is not to restrict the scope of the pollution exclusion. The inclusion of a specific provision concerning asbestos claims cannot reasonably be understood to mean that the pollution exclusion is inapplicable to other pollutants not specifically designated in a separate endorsement.

■ Claimant contends that even if the underlying complaints disclosed no possible basis for coverage, the "complaints could easily be amended, or discovery propounded, to identify" silica-containing products which may have caused injuries for which it was responsible. However, the complaints are based explicitly on the inhalation of silica dust arising from sandblasting operations. "An insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability or ways in which the third party claimant might amend its complaint at some future date. This approach misconstrues the principle of 'potential liability' under an insurance policy." (*Gunderson v. Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106, 1114 [44 Cal.Rptr.2d 272].)

Finally, claimant argues that the trial court abused its discretion in refusing to permit discovery before ruling on the order to show cause. Claimant sought to undertake discovery into the derivation of the terms of the pollution exclusion, and to ascertain whether Golden Eagle used a specific silica exclusion in other policies it issued. Given the marginal value of any such discovery and the expedited nature of proceedings under section 1032, the court did not abuse its discretion in refusing to defer consideration of the order to show cause to permit such discovery.

## Disposition

The orders from which these appeals were taken are affirmed.

McGuiness, P. J., and Corrigan, J., concurred.

A petition for a rehearing was denied March 28, 2005, and appellant's petition for review by the Supreme Court was denied June 15, 2005. Baxter, J., was of the opinion that the petition should be granted.