[No. B192216. Second Dist., Div. Three. Jan. 29, 2008.]

AMERICAN CASUALTY COMPANY OF READING, PA, Plaintiff and Respondent, v.
MICHAEL MILLER et al., Defendants and Appellants.

502

COUNSEL

Law Offices of Federico C. Sayre, Federico C. Sayre, Ronald Z. Gomez; Law Offices of Douglas Caiafa and Douglas Caiafa for Defendants and Appellants.

Colliau Elenius Murphy Carluccio Keener & Morrow, Michael T. Colliau, Cynthia L. Keener and Julie S. James for Plaintiff and Respondent.

OPINION

KITCHING, J.—

## INTRODUCTION

A worker in a public sewer system was seriously injured when a furniture stripping business released methylene chloride into the sewer system where he was working. The trial court granted summary judgment to the insurer of the furniture stripping business on the basis of a pollution exclusion clause contained in a comprehensive general liability policy (the CGL policy). We affirm. The injured worker's injuries arose from an event commonly thought of as environmental pollution. An ordinary insured would reasonably expect that the release of methylene chloride into a public sewer is environmental pollution. (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635 [3 Cal.Rptr.3d 228, 73 P.3d 1205] (*MacKinnon*).)

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Furniture Stripping Business*

Defendant and appellant Michael Miller (Miller) owned a furniture stripping business called Stripper Herk located in Santa Monica, California. As part of the business, Stripper Herk generated wastewaters containing solvents, including methylene chloride, and generated hazardous wastes that accumulated in drums on the premises.

The City of Santa Monica (the City) issued Stripper Herk an "Industrial Wastewater Permit—Manufacturing Facility." The permit allowed Stripper Herk to discharge wastewater from its premises into the City's sewer. The permit, however, prohibited the discharge of any solvents, including methylene chloride, into the sewer.

### 2. *The CGL Policy*

Plaintiff and respondent American Casualty Company of Reading, PA (American Casualty), provided Miller, doing business as Stripper Herk, with a CGL policy, which was effective from April 26, 2002, to April 26, 2003.

Coverage A of the policy provided coverage for bodily injury and property damage with a limit of $1 million per occurrence. Under Coverage A, the policy provided coverage for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage'" caused by an occurrence during the policy period. The policy also obligated American Casualty "to defend the insured against any 'suit' seeking damages."

### 3. *The Pollution Exclusion*

The CGL policy contained a pollution exclusion clause which provided in pertinent part that Coverage A did not apply to: "(1) 'Bodily Injury' or 'property damage' arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants': [¶] (a) At or from any premises, site, or location which is or was at any time owned or occupied by, or rented or loaned to, any insured."

The CGL policy defined "pollutants" as follows: "[A]ny solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

### 4. *The Accident*

On the morning of March 26, 2003, a private contractor hired by the City was working in the City's sewer lines which were downstream of the premises of Stripper Herk. Valenzuela, an employee of the private contractor, was repairing a 36-inch sewer line in front of and approximately 20 feet below Stripper Herk. Valenzuela noticed wastewaters discharging from a drain outlet into the sewer. The wastewaters soaked Valenzuela's clothing and caused him to lose consciousness. Monitors that measure the presence of dangerous chemicals sounded. Valenzuela sustained serious bodily injuries.

### 5. *The City's Investigation*

Later that day, inspectors from the City of Santa Monica Environmental and Public Works Management, Industrial Waste Section, inspected Stripper Herk. The investigators discovered organic solvents, including methylene chloride, discharging into Stripper Herk's floor sump and into the City's sewer system. The investigators conducted a dye test, which confirmed that Stripper Herk's industrial waste sump was tied into the sewer leading into the section of sewer line where Valenzuela was working at the time of the incident.

### 6. *The Criminal Proceedings Against Miller*

The investigation resulted in federal criminal proceedings against Miller. The federal proceedings concluded with Miller entering a plea agreement with the United States Attorney's Office for the Central District of California.

There, Miller pled guilty to (1) negligent discharge of pollutants into a publicly owned treatment works in violation of a permit; and (2) storage of hazardous wastes without a permit.

In the plea agreement, Miller and the United States Attorney stipulated to the following: "[Miller] and his employees allowed such wastewaters to flow into a sump located on the floor of [Stripper Herk's] premises. Located in the sump was a pipe connected to the [sewer]. The pipe was not properly sealed, which negligently allowed some of the wastewaters that accumulated in the sump to flow into the pipe and thereafter discharge into the [sewer]." Neither party presented any evidence as to how long methylene chloride wastewaters had escaped into the sewer.

### 7. *The* Zurich *Action*

On June 16, 2003, Zurich American Insurance Company (Zurich) sued Stripper Herk for reimbursement of workers' compensation benefits paid to Valenzuela following the incident (the *Zurich* action). There, Zurich alleged that Stripper Herk caused or permitted toxic compounds to enter the sewer and injure Valenzuela. Zurich also alleged that Stripper Herk retained sufficient control over its premises to owe Valenzuela a duty of care to avoid exposing him to an unreasonable risk of harm. Zurich alleged that the release of wastewaters breached the duty of care.

Miller notified American Casualty of the *Zurich* action, and that Zurich was seeking reimbursement of workers' compensation benefits it had paid and would pay to Valenzuela. American Casualty denied the claim on the basis of the pollution exclusion clause, and refused to defend or indemnify Miller with respect to the claim.

### 8. *Valenzuela Sues Miller and Stripper Herk*

In February 2004, Valenzuela filed suit against Miller and Stripper Herk. Valenzuela alleged eight causes of action, including negligence, negligence per se, premises liability, strict liability, battery, assault and negligent and intentional infliction of emotional distress (the *Valenzuela* action). Valenzuela alleged, inter alia, that Miller and Stripper Herk breached a duty of care by discharging wastewaters containing methylene chloride.

In May 2004, Miller tendered the *Valenzuela* action and retendered the *Zurich* action to American Casualty. On May 28, 2004, American Casualty refused to defend or indemnify Miller with respect to the lawsuits.

In January and February 2005, Miller again requested that American Casualty defend and indemnify him for damages resulting from Valenzuela's injuries. American Casualty again refused.

### 9. *The* Valenzuela *Action Settles*

In June 2005, the parties settled the *Valenzuela* action against Miller and Stripper Herk. As part of the settlement agreement, Miller assigned his rights under the CGL policy to Valenzuela. Valenzuela made a policy limit demand on American Casualty of $1 million. American Casualty declined the demand.

### 10. *American Casualty Files for Declaratory Relief*

On June 7, 2005, American Casualty filed a complaint for declaratory relief against Miller, doing business as Stripper Herk, and Valenzuela (defendants). American Casualty alleged that pursuant to the CGL policy, it had no duty to defend or indemnify Miller in either the *Valenzuela* or *Zurich* action. Defendants answered and filed a cross-complaint.

### 11. *The Trial Court Grants Summary Judgment in Favor of American Casualty*

On April 26, 2006, the trial court granted summary judgment in favor of American Casualty. The trial court found that under the pollution exclusion clause, quoted above, American Casualty was not required to defend or indemnify Miller, doing business as Stripper Herk, and thus had no liability to Valenzuela for his injuries from the methylene chloride. Defendants timely filed a notice of appeal.

## CONTENTIONS

Defendants contend the trial court erred as a matter of law by finding that American Casualty had no duty to defend or indemnify Miller, doing business as Stripper Herk, based on the pollution exclusion clause.

## STANDARD OF REVIEW

This court reviews de novo a trial court's grant of summary judgment. (*MacKinnon, supra,* 31 Cal.4th at p. 641.) In addition, interpretation of

insurance policy language is a question of law. (*Ibid.*) Therefore, we review de novo whether the pollution exclusion bars coverage for the injuries at issue in this case. (*Ibid.*)

■ In *Legarra v. Federated Mutual Ins. Co.* (1995) 35 Cal.App.4th 1472 [42 Cal.Rptr.2d 101] (*Legarra*), the court explained: "An insurer may move for summary adjudication that no potential for liability exists and thus no duty to defend where the evidence establishes as a matter of law there is no coverage. [Citation.] In an action seeking declaratory relief on the issue of a duty to defend, different showings are required of the insured and the insurer. 'To prevail, the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*. In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.*' [Citation.]" (*Id.* at p. 1479.)

## DISCUSSION

*The Pollution Exclusion Clause Is Not Ambiguous in the*
*Context of This Case and Excludes Coverage for*
*Valenzuela's Personal Injuries*

In *MacKinnon*, the California Supreme Court addressed the meaning and scope of a pollution exclusion clause in a CGL policy. The Supreme Court found the pollution exclusion clause was intended to exclude coverage for injuries resulting from events commonly thought of as environmental pollution, not all injuries arising from toxic substances. (*MacKinnon, supra*, 31 Cal.4th at p. 653.) The pollution exclusion clause in *MacKinnon* is substantially similar to the pollution exclusion at issue in this case. (*Id.* at p. 639.)[1]

In *MacKinnon*, a landlord hired a third party pest control company to exterminate yellow jackets in an apartment building. (*MacKinnon, supra*, 31 Cal.4th at p. 640.) After the company treated the apartment building on a number of occasions, a tenant died in the building. (*Ibid.*) The tenant's parents filed a wrongful death lawsuit against the landlord. The landlord tendered the defense to his insurer, which denied a duty to defend or

---

[1] The *MacKinnon* pollution exclusion provided: " 'We do not cover Bodily Injury or Property Damage (2) Resulting from the actual, alleged, or threatened discharge, dispersal, release or escape of pollutants: (a) at or from the insured location.' " (*MacKinnon, supra*, 31 Cal.4th at p. 639.)

The policy defined "Pollution or Pollutants" as " 'any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste materials. Waste materials include materials which are intended to be or have been recycled, reconditioned or reclaimed.' " (*MacKinnon, supra*, 31 Cal.4th at p. 639.)

indemnify based upon the pollution exclusion clause in the CGL policy. The landlord filed suit against his insurer. (*Ibid.*)

The trial court granted the landlord's motion for summary judgment, concluding that the pollution exclusion clause precluded coverage for the injuries. (*MacKinnon, supra,* 31 Cal.4th at pp. 640–641.) The Court of Appeal affirmed the trial court. The Supreme Court reversed. (*Id.* at p. 656.)

The *MacKinnon* court traced the historical evolution of pollution exclusion clauses. With respect to the particular pollution exclusion clause at issue, the court explained that courts in other jurisdictions were split as to the scope of such clauses. (*MacKinnon, supra,* 31 Cal.4th at pp. 641–642.) The court summarized: "One camp maintains that the exclusion applies only to traditional environmental pollution into the air, water, and soil, but generally not to all injuries involving the negligent use or handling of toxic substances that occur[] in the normal course of business. These courts generally find ambiguity in the wording of the pollution exclusion when it is applied to such negligence and interpret such ambiguity against the insurance company in favor of coverage. The other camp maintains that the clause applies equally to negligence involving toxic substances and traditional environmental pollution, and that the clause is as unambiguous in excluding the former as the latter. [Fn. omitted.]" (*Id.* at p. 642.)

The *MacKinnon* court then examined the language of the policy at issue in the case before it. The court noted that the CGL policy, like the insurance policy in this case, "obligated the insurer to pay 'all sums for which [the insured] become[s] legally obligated to pay as damages caused by bodily injury, property damage or personal injury.' " (*MacKinnon, supra,* 31 Cal.4th at p. 649.) The court explained that this language "establishe[d] a reasonable expectation that the insured will have coverage for ordinary acts of negligence resulting in bodily injury." (*Ibid.*) The court stated that "[c]overage will therefore be found unless the pollution exclusion conspicuously, plainly and clearly appraises the insured that certain acts of ordinary negligence, such as the spraying of pesticides in this case, will not be covered." (*Ibid.*)

The *MacKinnon* court found that the policy language was ambiguous. The court rejected the insurer's argument that the pollution exclusion, read literally and broadly, would extend to all acts of negligence involving substances that could be characterized as irritants or contaminants. Specifically, the insurer argued that pesticides are capable of causing irritation and can thus be defined as " 'irritants' " or " 'pollutants.' " (*MacKinnon, supra,* 31 Cal.4th at p. 644.) The insurer also argued that the spraying of pesticides could be described as " 'discharge' " or " 'dispersal.' " (*Id.* at p. 649.)

The *MacKinnon* court explained that the insurer's interpretation of the pollution exclusion clause would lead to absurd results because "[v]irtually any substance can act under the proper circumstances as an 'irritant or contaminant.'" (*MacKinnon, supra,* 31 Cal.4th at p. 650.) The court noted that chlorine contains irritating properties that could cause injury and "[i]ts dissemination throughout a pool may be literally described as a dispersal or discharge." (*Ibid.*) The court explained, however, that its research had not revealed any court or commentator that concluded that "such an incident would be excluded under the pollution exclusion." (*Ibid.*)

The *MacKinnon* court concluded: "In short, because [the insurer's] broad interpretation of the pollution exclusion leads to absurd results and ignores the familiar connotations of the words used in the exclusion, we do not believe it is the interpretation that the ordinary layperson would adopt." (*MacKinnon, supra,* 31 Cal.4th at p. 652.)

■ Instead, the *MacKinnon* court held that application of the pollution exclusion clause should be limited to "*injuries arising from events commonly thought of as pollution, i.e., environmental pollution . . . .*" (*MacKinnon, supra,* 31 Cal.4th at p. 653, italics added.) In reaching this conclusion, the court focused upon the commonly understood meanings of the terms used in the pollution exclusion clause.

First, the court explained that it would be unusual to consider the "normal, intentional application of pesticides" as a release or escape of a pollutant under the pollution exclusion clause. (*MacKinnon, supra,* 31 Cal.4th at p. 651.) The court explained that the terms " 'release' " and " 'escape' " connoted "some sort of freedom from containment" and that it would be unusual to characterize the normal application of pesticides as a " 'release' " or " 'escape' " of pesticides. (*Ibid.*)

The court also explained the terms "discharge" and "dispersal" as used in the pollution exclusion clause did not generally connote the normal intentional spraying of pesticides. The court explained that "[t]he notion of 'dispersal' as a *substantial* dissemination is reinforced by its use with the term 'pollutant.' Indeed, the word 'dispersal,' when in conjunction with 'pollutant,' is commonly used to describe the spreading of pollution widely enough to cause its dissipation and dilution. . . . In the present case, the application of pesticides in and around an apartment building does not plainly signify to the common understanding the 'dispersal' of a pollutant." (*MacKinnon, supra,* 31 Cal.4th at p. 651.)

Likewise, with respect to the term "discharge," the court explained that "[a]lthough the application of pesticides could literally be described as a

'discharge' of pesticides, that term is rarely used in this manner." (*MacKinnon, supra*, 31 Cal.4th at p. 651.) The court explained that, instead, the term "discharge" is "commonly used with pesticides to describe pesticide runoff behaving as a traditional environmental pollutant rather than pesticides being normally applied." (*Id.* at p. 652.)

■ Second, the Supreme Court focused on the word "pollution." (*MacKinnon, supra*, 31 Cal.4th at p. 652.) The court explained that the definition of pollutant, as including any irritant or contaminant, was too broad and that the court "must turn to the common connotative meaning of that term" as understood by a reasonable policyholder. (*Ibid.*) Quoting *Regional Bank of Colo. v. St. Paul Fire & Marine* (10th Cir. 1994) 35 F.3d 494, the *MacKinnon* court explained: " 'While a reasonable person of ordinary intelligence might well understand carbon monoxide is a pollutant when it is emitted in an industrial or environmental setting, an ordinary policyholder would not reasonably characterize carbon monoxide emitted from a residential heater which malfunctioned as "pollution." It seems far more reasonable that a policyholder would understand it as being limited to irritants and contaminants *commonly thought of as pollution* and not as applying to every possible irritant or contaminant imaginable.' " (*MacKinnon*, at pp. 652–653.) The court further explained that the common understanding of the word "pollute" indicated that it was " 'something creating impurity [or] something objectionable and unwanted.' " (*Id.* at p. 654.)

The court then noted that limiting the scope of the pollution exclusion clause to events commonly thought of as pollution was consistent with the use of the terms " 'discharge, dispersal, release or escape.' " (*MacKinnon, supra*, 31 Cal.4th at p. 653.) The court stated that "these terms, used *in conjunction with* 'pollutant,' commonly refer to the sort of conventional environmental pollution at which the pollution exclusion was primarily targeted." (*Ibid.*)

Thus, in the context of the case before it, the *MacKinnon* court concluded that "[t]he normal application of pesticides around an apartment building in order to kill yellow jackets would not comport with the common understanding of the word 'pollute.' " (*MacKinnon, supra*, 31 Cal.4th at p. 654.) The court further stated: "While pesticides may be pollutants under some circumstances, it is unlikely a reasonable policyholder would think of the act of spraying pesticides under these circumstances as an act of pollution." (*Ibid.*)

Finally, the *MacKinnon* court stated that because the pollution exclusion did not plainly and clearly exclude the landlord's allegedly negligent use of pesticides, it was necessary to interpret the clause in favor of coverage. (*MacKinnon, supra*, 31 Cal.App.4th at pp. 655–656.)

Two published California cases have examined *MacKinnon*. In *Garamendi v. Golden Eagle Ins. Co.* (2005) 127 Cal.App.4th 480 [25 Cal.Rptr.3d 642] (*Garamendi*), pursuant to a pollution exclusion clause similar to the clause at issue in the present case, Golden Eagle Insurance Company denied coverage to its insured, which was sued by workers for silica-related injuries.[2] The workers alleged that a sandblasting operation dispersed silica-containing dust in a large area, causing injury. (*Id.* at p. 483.) The *Garamendi* court explained that the pollution exclusion clause applied and Golden Eagle Insurance Company had no duty to defend its insured in relation to the silica-related injuries. (*Id.* at p. 488.)

The *Garamendi* court first noted that the *MacKinnon* court limited the scope of the pollution exclusion " 'to injuries arising from events commonly thought of as pollution, i.e., environmental pollution.' " (*Garamendi, supra,* 127 Cal.App.4th at p. 485.) Applying *MacKinnon* to the facts before it, the *Garamendi* court explained: "But even if silica is not one of the enumerated items listed in the policy definition of pollutants, that listing is not exclusive and silica dust nonetheless comes within the broad definition of 'any solid, liquid, gaseous, or thermal irritant or contaminant.' Indeed, federal regulations identify silica dust as an air contaminant." (*Id.* at pp. 485–486.) The *Garamendi* court continued: "[U]nder *MacKinnon* the mere fact that silica, like almost anything else, may be an irritant or contaminant under some circumstances is not dispositive. But unlike the residential use of a pesticide for the purpose of killing insects, the widespread dissemination of silica dust as an incidental by-product of industrial sandblasting operations most assuredly is what is 'commonly thought of as pollution' and 'environmental pollution.' " (*Id.* at p. 486.)

■ The *Garamendi* court noted that "[c]ontrary to claimant's suggestion, *there need not be 'wholesale environmental degradation, such as occurred at,* for example, Love Canal, or the Stringfellow Acid Pits' to constitute pollution." (*Garamendi, supra,* 127 Cal.App.4th at p. 486, italics added.)

The second California case applying *MacKinnon* was *Ortega Rock Quarry v. Golden Eagle Ins. Corp.* (2006) 141 Cal.App.4th 969 [46 Cal.Rptr.3d 517] (*Ortega Rock*). There, following rain storms, the Ortega Rock Quarry (Ortega) placed fill dirt along a washed-out access road. In

[2] In *Garamendi*, the pollution exclusion excluded coverage for " ' "[b]odily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.' " (*Garamendi, supra,* 127 Cal.App.4th at p. 484.)

The policy defined pollutants as " 'any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. . . .' " (*Garamendi, supra,* 127 Cal.App.4th at p. 484.)

response, the Environmental Protection Agency (EPA) issued an administrative order alleging that the fill along the road resulted in the discharge of fill material into the Lucas Canyon Creek. (*Id.* at p. 973.) The EPA ordered Ortega, inter alia, to cease the discharge of all fill material, and to submit an interim erosion plan and site restoration plan. (*Id.* at p. 974.) The EPA order alleged a violation of section 1311(a) of title 33 of the United States Code, which made it unlawful for any person to discharge a pollutant into the United States waterways without a permit. (*Ortega Rock,* at p. 974.)

Ortega's lessor, Santa Margarita Company, filed suit against Ortega alleging that Ortega had damaged the creek and surrounding property. (*Ortega Rock, supra,* 141 Cal.App.4th at p. 974.) Ortega submitted the claim to its insurers. The insurers denied coverage based upon pollution exclusion clauses similar to the one at issue in the present case.[3] The insurers asserted that rocks and dirt were "pollutants" within the policy definitions and thus subject to the pollution exclusion. (*Id.* at pp. 975–976.) The trial court granted the insurers' motions for summary judgment and summary adjudication finding that the pollution exclusions in the policies excluded coverage for the claims. (*Id.* at p. 976.)

The *Ortega Rock* court affirmed. (*Ortega Rock, supra,* 141 Cal.App.4th at p. 991.) The court held that the pollution exclusion was not ambiguous on the ground that the definition of the term "pollutants" failed to specify dirt and rocks. (*Id.* at pp. 981–990.) The court rejected Ortega's assertion that because dirt and rocks are naturally occurring, they are not pollutants. The court noted that dirt and rocks were considered pollutants within the meaning of the Clean Water Act (33 U.S.C. § 1251 et seq.). (141 Cal.App.4th at p. 981.)

One case cited with approval in *MacKinnon* also dealt with the scope of a pollution exclusion clause similar to the one at issue in the present appeal. In

---

[3] For example, in *Ortega Rock,* one of the pollution exclusion clauses excluded coverage for: " '1) "Bodily injury," "property damage," or "personal injury" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time. [¶] 2) Any loss, cost or expense arising out of any: [¶] a. Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of pollutants; or [¶] b. Claim or suit by or on behalf of any authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants; or [¶] c. Payment related to the investigation or defense for any loss, injury or damage, or any cost, fine or penalty, or for any expense or claim or suit related to 1) and 2) a. and b. above.' " (*Ortega Rock, supra,* 141 Cal.App.4th at p. 975.)

The policy defined pollutants as follows: " '[A]ny solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.' " (*Ortega Rock, supra,* 141 Cal.App.4th at p. 975.)

*Legarra*, the plaintiffs purchased a property which had been used as a petroleum bulk plant. (*Legarra, supra*, 35 Cal.App.4th at p. 1476.) A governmental agency learned that there likely had been fuel releases at the property, and advised the plaintiffs that they might be responsible for certain costs in relation to the investigation and monitoring of the property. (*Id.* at p. 1478.) The plaintiffs tendered the claim to their insurer, which declined coverage based upon a pollution exclusion clause similar to the clause at issue in the present case. (*Id.* at pp. 1478–1479.)[4]

The trial court granted summary judgment in favor of the insurer, concluding that it had no duty to defend or provide indemnification based upon the pollution exclusion. The Court of Appeal affirmed. (*Legarra, supra*, 35 Cal.App.4th at pp. 1479–1482.)

The insureds argued that it was not clear whether petroleum was a pollutant under the pollution exclusion clause. The court rejected that argument and explained that under the policy definition, pollutants included any liquid irritant or contaminant. (*Legarra, supra*, 35 Cal.App.4th at p. 1481.)

In the context of analyzing whether the insured had coverage under the personal injury portion of the policy, the *Legarra* court stated that the pollution exclusion clause clearly excluded coverage for this kind of property damage resulting from such groundwater contamination. The court held that an insured could not have reasonably expected coverage for the property damage resulting from the petroleum contamination. (*Legarra, supra*, 35 Cal.App.4th at pp. 1485–1486.)

■ Applying the analysis of *MacKinnon* to this case, we consider how a reasonable insured might understand the pollution exclusion language at

---

[4] The *Legarra* pollution exclusion provided that the pollution exclusion did not apply: " '(1) to bodily injury or property damage arising out of the actual, alleged, or threatened discharge, dispersal, release or escape of pollutants: [¶] (a) at or from premises owned, rented or occupied by the named insured; [¶] (b) at or from any site or location used by or for the named insured or others for the handling, storage, disposal, processing or treatment of waste; [¶] (c) which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for the named insured or any person or organization for whom the named insured may be legally responsible; or [¶] (d) at or from any site or location on which the named insured or any contractors or subcontractors working directly or indirectly on behalf of the named insured are performing operations: [¶] (i) if the pollutants are brought on or to the site or location in connection with such operations; or [¶] (ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants. [¶] (2) to any loss, cost or expense arising out of any governmental direction or request that the named insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants. [¶] Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.' " (*Legarra, supra*, 35 Cal.App.4th at p. 1477.)

issue. Pollutants are defined in the policy as including, inter alia, chemicals. Methylene chloride is a chemical. Therefore, methylene chloride is a "pollutant" under the policy definition. In addition, the " 'word "pollute" indicates that it is something creating impurity, something objectionable and unwanted.' " (*MacKinnon, supra,* 31 Cal.4th at p. 654.) Certainly, a layperson would reasonably understand the release of this chemical into the public sewer system is something objectionable and unwanted.

Miller pled guilty to negligently discharging pollutants into a public sewer system. The pollution exclusion clause provided that there is no insurance coverage for " '[b]odily injury' or 'property damage' arising out of the actual . . . discharge, dispersal, seepage, migration, release or escape of 'pollutants' . . . [a]t or from any premises, site, or location which is or was at any time owned or occupied by, or rented or loaned to, any insured." Looking at this language, the release of methylene chloride into the sewer fits within this pollution exclusion clause because Miller, doing business as Stripper Herk, discharged, dispersed, released or allowed the escape of a pollutant from "premises" that were "owned or occupied by, or rented" by the insured.

█ The *MacKinnon* court noted that this type of pollution exclusion clause, called an "absolute pollution exclusion," was promulgated to eliminate insurance coverage for gradual environmental degradation and government-mandated cleanups under the Superfund legislation. (*MacKinnon, supra,* 31 Cal.4th at p. 645.) A layperson would reasonably understand that the release of methylene chloride into a public sewer is a form of environmental degradation. This is not analogous to the normal, intentional application of pesticides in an apartment building.

Miller and Valenzuela assert that *MacKinnon* held that pollution exclusions were not intended to exclude coverage for one-time, ordinary acts of negligence. They equate what happened in this case to an ordinary act of negligence. We reject this assertion.

█ There is no evidence in the record to support defendants' assertion that this was a one-time negligent act. In any event, assuming for purposes of this opinion only that this was a one-time release of methylene chloride, we conclude that the pollution exclusion clause excludes coverage. *MacKinnon* did not hold that negligent environmental pollution is different from intentional environmental pollution. Instead, *MacKinnon* held that pollution exclusion clauses bar coverage for an act of negligence involving a pollutant if the negligent act is commonly thought as environmental pollution. (*MacKinnon, supra,* 31 Cal.4th at p. 653.) Permitting methylene chloride to be released into a public sewer, however, is an act of environmental pollution.

In addition, Miller and Valenzuela assert that *MacKinnon* is limited to catastrophic events such as large scale environmental pollution. We reject this argument. There is no indication in *MacKinnon* that the Supreme Court intended such a limitation. The *Garamendi* court addressed this contention, stating that "[c]ontrary to claimant's suggestion, *there need not be 'wholesale environmental degradation*, such as occurred at, for example, Love Canal, or the Stringfellow Acid Pits' to constitute pollution." (*Garamendi, supra*, 127 Cal.App.4th at p. 486, italics added.)

Miller and Valenzuela also assert that the sewer was sealed and the methylene chloride was contained, thus resulting in no environmental pollution. This fact, however, is not determinative of whether the release of methylene chloride into a public sewer system is an event commonly thought of as environmental pollution. The fact that the sewer was sealed (if true) was merely fortuitous and prevented more widespread pollution or bodily injury than what occurred.

■  The test in *MacKinnon* is not based upon the extent of injury, but upon the type of pollutant and how it is released into the environment. Making a distinction based upon the extent of bodily injury or property damage would be unworkable in practice. For example, it would be difficult to conclude that if an underground gasoline tank only leaked for one week or one month as opposed to one year, there should be some sort of distinction as to whether the pollution exclusion excludes coverage.

In the present case, Miller, the owner of the furniture stripping business, dealt with chemicals regularly. Miller knew or should have known that the chemicals must be properly stored and that release of the chemicals into the environment could cause serious bodily injury or property damage. An ordinary insured standing in Miller's shoes would reasonably expect that such a release would constitute environmental pollution.

In conclusion, the pollution exclusion clause in the context of this case is unambiguous. The pollution exclusion clause clearly and conspicuously excluded coverage for the dispersal of methylene chloride into the public sewer. In the words of *MacKinnon*, Valenzuela's injuries arose from an event commonly thought of as environmental pollution. A reasonable insured would expect that the pollution exclusion clause in the CGL policy would exclude coverage for Valenzuela's injuries. American Casualty has therefore established the absence of any potential for coverage. The trial court did not err by granting summary judgment.

## DISPOSITION

The judgment is affirmed. American Casualty is awarded costs on appeal.

Croskey, Acting P. J., and Aldrich, J., concurred.

A petition for a rehearing was denied February 27, 2008, and appellant's petition for review by the Supreme Court was denied April 23, 2008, S161561. George, C. J., did not participate therein.