[No. A128443. First Dist., Div. Four. Aug. 17, 2011.]

THE VILLA LOS ALAMOS HOMEOWNERS ASSOCIATION, Plaintiff and Appellant, v.
STATE FARM GENERAL INSURANCE COMPANY, Defendant and Respondent.

524

## COUNSEL

Berding & Weil, Matt J. Malone and Chad T. Thomas for Plaintiff and Appellant.

Chapman, Popik & White, Susan M. Popik and Renee C. Callantine for Defendant and Respondent.

Amy Bach; Anderson Kill & Olick and John G. Nevius as Amicus Curiae.

## OPINION

**REARDON, J.**—In *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635 [3 Cal.Rptr.3d 228, 73 P.3d 1205] (*MacKinnon*), our Supreme Court determined that the standard pollution exclusion clause in a comprehensive general liability (CGL) policy was intended to exclude coverage for injuries resulting from events commonly regarded as environmental pollution. The court therefore rejected a broader, literal interpretation of the clause that would foreclose coverage for any and all injuries arising from harmful substances. (*Id.* at pp. 649, 653.) So construed, the court further held that it was unlikely a reasonable policyholder would think that the activity in question—namely, the normal but negligent spraying of pesticides around an apartment building in order to kill yellow jackets—was an act of pollution. (*Id.* at p. 654.)

 Today we are asked to decide whether *MacKinnon*'s interpretation limiting the scope of the pollution exclusion in a standard CGL policy to environmental pollution also governs the interpretation of a comparable pollution exclusion in a first party property insurance policy. We conclude that it does.

We must further decide whether the disturbing of asbestos during the scraping of acoustical "popcorn" ceilings in a three-story, 18-unit residential building, in which asbestos fibers were released into the air, the common area hallways and stairwells, individual units, and out to the common areas and public spaces and a private street outside building, constitutes environmental pollution. We likewise conclude that it does, and hence the pollution exclusion in the first party property insurance policy of appellant The Villa Los Alamos Homeowners Association (Association) did apply to preclude coverage for remediation cleanup work. Accordingly, we affirm the judgment in favor of respondent State Farm General Insurance Company (State Farm).

## I. BACKGROUND

### A. *The Association and Its Policy*

The Association is a California nonprofit corporation whose purpose is to manage, operate, maintain and repair the Association's 94-unit condominium complex. State Farm insured the Association under a "Condominium/Association Policy" for the period January 15, 2006, through January 15, 2007. This was a comprehensive policy that provided both coverage for first party property losses, as well as third party business liability claims, subject to the policy's exclusions and limitations.

Under section I of the policy, State Farm agreed to insure "for accidental direct physical loss" to buildings and structures and business personal property owned by the Association and caused by an insured loss, unless specifically limited or excluded by the policy. This is an " 'open peril' " form of policy, analogous to an " 'all-risk' " policy, in which the insurer provides coverage for all losses not specifically excluded by the policy. (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 751 & fn. 2 [27 Cal.Rptr.3d 648, 110 P.3d 903].) The coverage language in this type of policy is thus deemed to be quite broad. (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470 [9 Cal.Rptr.3d 701, 84 P.3d 385] (*E.M.M.I.*).) Section I exclusions included the following pollution exclusion: "2. We do not insure under any coverage for any loss caused by one or more of the items below: . . . 1. the presence, release, discharge or dispersal of pollutants, meaning any solid, liquid, gaseous or thermal irritant or contaminant, including vapor, soot, fumes, acids, alkalis, chemicals and waste . . . ."

### B. *Scraping of Acoustical Ceiling*

In 2006 the Association contracted with Cal Coast Construction (Cal Coast) to scrape the "acoustical (popcorn) ceilings and stairways" in building 300, a three-story, 18-unit affair. The Association leadership was aware that

there was some asbestos in the ceiling, and a resident was privy to a report that alleged the spray-applied acoustical material (SAAM) contained less than 1 percent asbestos. Cal Coast commenced its work in June 2006 and in the process disturbed asbestos contained in the acoustical ceilings, releasing asbestos fibers into the air, the common area hallways and stairwells, individual units in building 300, and the common areas and public spaces outside the building. The Bay Area Air Quality Management District (District) responded to building 300, cited Cal Coast and removed the company from the project. It ordered the Association to perform a comprehensive abatement of the building, including all common areas and separate interest areas, individual units, and residents' personal property.

The Association retained Forensic Analytical to investigate the nature and extent of the contamination and to make recommendations for remediation. The firm confirmed that comprehensive abatement was needed. Its investigation revealed the presence of SAAM debris throughout building 300, "including corridors, stairwells, in the residential units, HVAC system, and in the front portion of the exterior grounds of the building." The SAAM debris outside building 300 was present in the rock gardens, on sidewalks, in bushes and grass in front of the building, and in parking lots and a private street. "Laboratory testing confirmed the debris contain[ed] asbestos (trace to 2% chrysotile)."

Forensic Analytical recommended evacuation of all tenants in building 300; the cleaning and testing of all contents; removal and proper disposal of all carpets; removal of remaining SAAM in the hallways and stairwells; the cleaning of all vertical and horizontal surfaces as well as the HVAC systems; and the cleaning of the front areas of the building (rock garden, sidewalks, parking lot, and street).

The Association hired a contractor to perform the cleanup protocol outlined by Forensic Analytical, and pursuant to District requirements.

C. *Litigation*

Meanwhile, the Association demanded that Cal Coast retain an environmental hygienist and abatement company to clean and "abate" building 300, but the company refused. Without success the Association also tendered claims to State Farm, its insurance carrier. The insurer denied coverage under the first party property provisions as well as the business liability portion of the policy. Ultimately the Association paid $650,000 to fully clean and abate building 300.

The Association sued Cal Coast; Cal Coast cross-complained against the Association and Golden Pacific Association Management (Golden Pacific),

the Association's property manager; and Golden Pacific tendered the cross-complaint to the Association for defense. The Association in turn tendered the cross-complaint, and Golden Pacific's request for defense, to State Farm, and asked for reconsideration of the initial denial of the first party coverage claim for remediation expenses. Correspondence flurried back and forth from mid-2007 through early 2008, with the Association repeatedly providing additional requested information and asking State Farm to accept tender of the third party claims and reevaluate first party coverage. In the end State Farm denied coverage for both sets of claims, asserting as to the property damage claims that the total pollution exclusion and faulty workmanship exclusion barred coverage.

Thereafter the Association sued State Farm, asserting causes of action for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory relief. In the meantime, the Association's action against Cal Coast went to trial; it won a judgment of over $600,000, but the contractor was insolvent and its insurance carrier denied coverage because the policy contained an asbestos exclusion disclaiming coverage for any "asbestos-related injury. . . ."

State Farm moved successfully for summary adjudication in the instant action as to the first party claims. The trial court granted summary adjudication on the first party claims, ruling that "the test for whether the pollution exclusion excludes coverage is based upon the type of pollutant and whether it is released in a way that constitutes (environmental) pollution." According to the court, this state considers asbestos to be a pollutant, and more significantly, that it is a pollutant "is a fact of common knowledge of which the court . . . may take judicial notice." As to the manner in which the asbestos was released, the court concluded "it is irrelevant whether it was negligent or intentional or a one-time incident. What appears relevant is the scope of the degradation—i.e., was it contained inside or did it reach the outside environment? The undisputed facts . . . establish that the asbestos release created 'environmental pollution' as it was airborne and was found in the street, driveways, gardens, sidewalk, etc."

The Association dismissed with prejudice its third party claims, the parties stipulated to the dismissal and the court entered judgment in favor of State Farm. This appeal followed.

## II. DISCUSSION

### A. *Standard of Review; Interpretation Principles*

We review de novo the trial court's decision on summary adjudication. (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16,

22 [4 Cal.Rptr.3d 785].) As pertinent here, we undertake our review of the lower court's interpretation of the insurance policy under our familiar rules of contract interpretation. (*E.M.M.I., supra*, 32 Cal.4th at p. 470.)

The overarching aim of contract interpretation is to give effect to the parties' mutual intentions at the time of contracting. (Civ. Code, § 1636.) We infer this intent, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The "clear and explicit" meaning of policy language governs our interpretation unless such interpretation leads to an absurd end. (*Id.,* § 1638.) We construe the words of a policy in their "ordinary and popular sense" unless the parties use them in a technical sense or a "special meaning" is ascribed to them by usage. (*Id.*, § 1644.)

A policy provision is ambiguous if it is susceptible to more than one reasonable construction. (*Helfand v. National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 869, 880 [13 Cal.Rptr.2d 295].) But, we will not strain the language to create an ambiguity, or label a provision ambiguous simply by isolating phrases and regarding them in the abstract. (*Ibid.*) Rather, courts will construe the provision in relation to the whole of the instrument, and may explain the policy by reference to the circumstances of its making, and the matter to which it pertains. (Civ. Code, §§ 1641, 1647; *E.M.M.I., supra*, 32 Cal.4th at p. 470.) The correct inquiry is whether the provision is ambiguous in the context of the policy at hand and the circumstances of the particular case. (*E.M.M.I.*, at p. 470.)

Finally, we interpret insurance coverage broadly in order to afford the insured the greatest possible protection, and conversely interpret exclusionary clauses narrowly against the insurer; moreover, exclusionary clauses cannot be unclear. (*MacKinnon, supra*, 31 Cal.4th at p. 648.) " ' "[A]ny exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect." ' " (*Ibid.*) It is the insured's burden to show that a particular claim falls within policy coverage, but the insurer bears the burden of showing that such claim is excluded by clear and unmistakable language. (*Ibid.*) A court examining an exclusionary clause "must attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the exclusionary language." (*Id.* at p. 649.)

## B. *The Pollution Exclusion Precluded Coverage*

The Association is adamant that *MacKinnon*, a third party coverage case, applies to its first party claim, and that under that authority, the pollution exclusion does not pertain to a single, negligent, localized asbestos release. Accordingly, it urges reversal. Some background is in order.

### 1. MacKinnon *and Its Progeny*

MacKinnon was the owner of an apartment building who, at the request of a tenant, hired a pest control company to eradicate yellow jackets at the apartment. The company treated the building several times and the tenant died from pesticide exposure. Her parents sued; MacKinnon tendered defense to his insurer, which concluded that the pollution exclusion precluded coverage. Suing his insurer, MacKinnon lost at the trial and appellate court levels on grounds that the pollution exclusion was clear and unambiguous and there was no potential for coverage.

Reversing, our Supreme Court first attended to the historical background of the pollution exclusion, noting that in 1970 Congress " 'substantially amended the Clean Air Act in an effort to protect and enhance the quality of the nation's air resources. [Citations.] The passage of these amendments, which included provisions for cleaning up the environment, imposed greater economic burdens on insurance underwriters, particularly those drafting standard-form CGL policies. [Citation.] [¶] 'In the wake of these events, the insurance industry became increasingly concerned that the 1966 occurrence-based policies were "tailor-made" to cover most pollution-related injuries. To that end, changes were suggested, and the industry proceeded to draft what was to eventually become the pollution exclusion . . . .' " (*MacKinnon, supra*, 31 Cal.4th at p. 643, quoting from an Ill. Supreme Court opinion, *American States Ins. Co. v. Koloms* (1997) 177 Ill.2d 473 [227 Ill.Dec. 149, 687 N.E.2d 72, 80].)

The court went on to explain that these efforts resulted in an endorsement to the standard form CGL policy adopted in 1970 as exclusion (f). (*MacKinnon, supra*, 31 Cal.4th at p. 643.) Then in 1985, following significant and extensive litigation over the precise meaning of certain words in exclusion (f), the insurance industry drafted a new version of the exclusion, referred to as the " 'absolute pollution exclusion.' " (*MacKinnon, supra*, 31 Cal.4th at p. 644.) The motivation for the amended exclusion was twofold, namely to eliminate " 'coverage for gradual environmental degradation and government-mandated cleanup such as Superfund response cost reimbursement.' " (*Id.* at p. 645, quoting Stempel, *Reason and Pollution: Correctly Construing the "Absolute" Exclusion in Context and in Accord with Its Purpose and Party Expectations* (1998) 34 Tort & Ins. L.J. 1, 32.)

Next, the *MacKinnon* court looked at the specific coverage language of the policy, in order to understand the insured's reasonable expectations *apart from* the exclusion. The policy at issue was a standard CGL policy obligating the insurer to pay damages that the insured is legally obligated to pay for bodily or personal injury, or property damages. This language established "a

reasonable expectation that the insured will have coverage for ordinary acts of negligence resulting in bodily injury." (*MacKinnon, supra,* 31 Cal.4th at p. 649.) The court rejected the insurer's insistence on a literal reading of the pollution exclusion and discernment of meaning with reference to dictionary meanings of key words such as "discharge" and "irritant," a reading that would embrace "virtually all acts of negligence involving substances that can be characterized as irritants or contaminants." (*Ibid.*) As well, the insurer's approach does "not necessarily yield the 'ordinary and popular' sense of the word if it disregard[ed] the policy's context." (*Ibid.*) Rather, in divining the meaning of certain key words in the policy such as " 'irritant,' " " 'pollutant,' " " 'discharge,' " and "release," the court "must attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the exclusionary language." (*Ibid.*) Moreover, the full implications of the insurer's approach easily could lead to unreasonable and absurd results such that, for example, applying iodine with an eyedropper onto a cut could be characterized in a literal sense as the discharge of an irritant, within the wording of the pollution exclusion. (*Id.* at p. 650.)

■ Concluding that the insurer's interpretation of the pollution exclusion was overbroad lead to absurd results and ignored familiar connotations of the words used in the exclusion, the court held that a reasonable policyholder would understand the policy to exclude "injuries arising from events commonly thought of as pollution, i.e., environmental pollution." (*MacKinnon, supra,* 31 Cal.4th at p. 653.) It held that the " 'common understanding of the word "pollute" indicates that it is something creating impurity, something objectionable and unwanted.' " (*Id.* at p. 654.) Further, limiting the scope of the exclusion was consistent with the clause's choice of the terms " 'discharge, dispersal, release or escape,' " which, "used *in conjunction with* 'pollutant,' commonly refer to the sort of conventional environmental pollution at which the pollution exclusion was primarily targeted." (*Id.* at p. 653.) This interpretation was also consistent with the history and purpose of the clause. (*Ibid.*)

Finally, the court emphasized that its interpretation limiting the exclusion to environmental pollution was reasonable in view of the purposes of CGL policies, namely to afford the insured " ' "the broadest spectrum of protection against liability for unintentional and unexpected personal injury or property damage . . . ." ' " (*MacKinnon, supra,* 31 Cal.4th at p. 654.)

Post-*MacKinnon* cases following its analysis have upheld applicability of the exclusion in a variety of settings involving CGL policies. (*Garamendi v. Golden Eagle Ins. Co.* (2005) 127 Cal.App.4th 480, 486 [25 Cal.Rptr.3d 642] (*Golden Eagle*) [the widespread dissemination of silica dust as a by-product of industrial sandblasting operation would commonly be thought of as

environmental pollution and thus came within the exclusion, the court also noting that there need not be wholesale environmental degradation to constitute pollution]; *Ortega Rock Quarry v. Golden Eagle Ins. Corp.* (2006) 141 Cal.App.4th 969, 980–981, 990 [46 Cal.Rptr.3d 517] (*Ortega*) [pollution exclusion precluded coverage for rock quarry operator's activities of placing dirt and rocks in creek bed; dirt and rocks were pollutants subject to the exclusion]; *American Casualty Co. of Reading, PA v. Miller* (2008) 159 Cal.App.4th 501, 515 [71 Cal.Rptr.3d 571] (*Miller*) [layperson reasonably would understand release of methylene chloride into public sewer is a form of environmental degradation; coverage precluded even if triggering event was a negligent one-time release]; *Cold Creek Compost, Inc. v. State Farm Fire & Casualty Co.* (2007) 156 Cal.App.4th 1469, 1471 [68 Cal.Rptr.3d 216] [pollution exclusion barred coverage for offensive and injurious odors coming from a compost facility and spreading over a mile away].)

### 2. MacKinnon*'s Applicability to First Party Property Coverage Claims*

Although the trial court acknowledged State Farm's position—namely, that *MacKinnon* does not control the outcome here because *MacKinnon* was decided in the context of principles specific to policies that insure against third party liability claims which have no analog to first party property coverage claims—it did not directly decide the matter. Rather, it determined that under the *MacKinnon* "test" as explicated in *Miller, supra,* 159 Cal.App.4th 501, the pollution exclusion ruled out coverage. As a threshold matter, we resolve that the general principles announced in *MacKinnon* concerning the pollution exclusion also pertain in the context of a coverage dispute over first party property insurance claims based on an analogous pollution exclusion.

We are mindful that there are analytical differences between first party property and third party liability policies. Our Supreme Court in *Garvey v. State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 407 [257 Cal.Rptr. 292, 770 P.2d 704] 'framed the distinctions well: "[T]he right to coverage in the third party liability insurance context draws on traditional tort concepts of fault, proximate cause and duty. This liability analysis differs substantially from the coverage analysis in the property insurance context, which draws on the relationship between perils that are either covered or excluded in the contract. In liability insurance, by insuring for personal liability, and agreeing to cover the insured for his own negligence, the insurer agrees to cover the insured for a broader spectrum of risks." In an all-risk policy or open peril first party property policy such as the one at issue, generally the risk of physical loss is covered and the exclusions thus become the limitation on loss coverage. (*Ibid.*) On the other hand, under a third party liability policy, the

focus initially is on the insured's obligation to pay for injury or damage arising from an " 'occurrence.' " (*Id.* at pp. 407–408.)

 It is also true, as State Farm points out, that in ascertaining the meaning of the pollution exclusion, the *MacKinnon* court highlighted the coverage language of the CGL policy, which insured against negligent acts by the insured that caused bodily injury and property damage to third parties. This language established a reasonable expectation of coverage for ordinary acts of negligence causing injury. (*MacKinnon, supra*, 31 Cal.4th at p. 649.) In view of this expectation, coverage would be forthcoming "unless the pollution exclusion conspicuously, plainly and clearly apprises the insured that certain acts of ordinary negligence, such as the spraying of pesticides . . . , will not be covered." (*Ibid.*) Further, the chosen interpretation limiting the exclusion to environmental pollution was in keeping with the purpose of CGL policies to afford the broadest scope of protection against liability for unintentional personal injury and property damage resulting from the conduct of the insured's business. (*Id.* at p. 654.) The broad interpretation advocated by the insurer would undermine that purpose and exclude virtually all injuries entailing substances that cause harm. (*Ibid.*)

 We part ways with State Farm, however, in its insistence that *MacKinnon's* restriction of the pollution exclusion to traditional environmental pollution has no application to losses arising under an open peril first party property insurance policy. Coverage language in an all-risk or open peril policy is *quite broad*, generally insuring against all losses not expressly excluded. (*E.M.M.I., supra*, 32 Cal.4th at p. 470.) Moreover, we broadly interpret coverage language to give insureds the greatest possible protection, while narrowly interpreting exclusionary clauses against the insurer. (*MacKinnon, supra*, 31 Cal.4th 635, 648.)

In the present case, the exclusion in the first party coverage section of the policy bans coverage for any loss caused by the "presence, release, discharge or dispersal of pollutants," while the exclusion pertinent to third party claims removes coverage for injuries arising out of "discharge, seepage, migration, dispersal, spill, release or escape of pollutants."[1] These clauses, for all practical purposes and in all material respects, are identical to one another and to the exclusion at issue in *MacKinnon*. There is no principled reason, based on third party versus first party distinctions, to reject *MacKinnon's* fundamental directive that the pollution exclusion is aimed at environmental pollution, and instead adopt a dictionary-based, literal language approach to divining whether the coverage decision here was correct.

---

[1] The exclusion in *MacKinnon* did not include the terms "seepage," "migration," and "spill." (*MacKinnon, supra*, 31 Cal.4th at p. 639.)

As a sister-state court has well stated, "[t]he commonly understood meaning of the [pollution exclusion] language in question should not be held to be different depending on whether it is used in a 'first-party' or 'third-party' policy." (*Vigilant Ins. Co. v. V.I. Technologies, Inc.* (N.Y.App.Div. 1998) 253 A.D.2d 401, 402 [676 N.Y.S.2d 596].) There the insured company was in the business of fractionating whole blood plasma into component parts, using refrigerated centrifuge machines. The blood plasma was damaged by seepage of the coolant ethylene glycol, a chemical. The policy in question excluded any loss from the release, discharge or dispersal of pollutants, which, by definition included chemicals. Construing the exclusion according to common speech and the reasonable expectation of the insured businessperson, the court held that no one would say that the insured was "a 'polluter,' because the ordinary meaning of the term would not apply. Neither can it be said that the words 'release, discharge or dispersal' apply here, since in the context of 'pollution,' those words connote a spread beyond containment in the owner's premises, to the outside air, land or water." (*Id.* at p. 403.)

Moreover, here, as is common, *first and third party coverage is provided in a single policy.* State Farm in effect asks us to interpret the pollution exclusion differently depending on whether first party or third party coverage is implicated, notwithstanding that the same type of act or event could trigger a claim under either section of the policy. A reasonable insured, purchasing one policy containing both kinds of coverage, each with a pollution exclusion identical in all material respects, would not expect that the words in the two exclusions would be interpreted differently, and with different legal outcomes, depending on where they appeared in the policy.

And more to the point, when construing a first party homeowners insurance policy as opposed to a CGL policy, we do not abandon the cardinal rule that courts are to give effect to the meaning of words in their ordinary and popular sense. (Civ. Code, § 1644.)

Further, State Farm has not produced any argument or evidence that the pollution exclusion in first party policies has an historical track and derivation that differs from that in third party policies.

For all these reasons, we conclude that a reasonable insured would expect both exclusions to apply to environmental pollution. This conclusion is bolstered by the common history and the fact that all-peril property policies likewise broadly cover losses unless specifically excluded or limited.

### 3. *The Release of Asbestos Constituted Environmental Pollution*

Reading the exclusionary language in accord with *MacKinnon* as pertaining to environmental pollution, the question remains: Did the accidental

release and airborne dissemination of asbestos fibers in this case amount to what is commonly regarded as "environmental" pollution?

a. *Threshold issues.* We first attend to two threshold matters: Is asbestos a "pollutant" within the policy exclusion, and what was the mechanism by which it caused harm in this case?

1. *Asbestos is a pollutant.* The court in *Golden Eagle, supra,* 127 Cal.App.4th 480 answered this question in a similar context involving exposure to silica, another natural product like asbestos. It held that even if silica were not " 'smoke, vapor, soot, fumes, acid, alkalis, chemicals [or] waste,' " per the enumerated items listed in the policy definition of "pollutant," that listing was not exclusive and silica dust came within the broad definition of " 'any solid, liquid, gaseous, or thermal irritant or contaminant.' " (*Id.* at pp. 485–486.) The same could be said for asbestos.

Moreover, as the trial court noted, it is proper to consider state and federal environmental laws when determining whether a particular substance is a "pollutant" within a pollution exclusion. Such laws may provide insight into the scope of a policy's definition without being specifically incorporated into that definition. (*Ortega, supra,* 141 Cal.App.4th at p. 980.) Among other designations, asbestos is a "toxic pollutant" under the Federal Water Pollution Control Act[2] (33 U.S.C. § 1317; 40 C.F.R. § 401.15 (2011)) and a "hazardous air pollutant[]" under the federal Clean Air Act[3] (42 U.S.C. § 7412(b)). At the state level, the State Air Resources Board has primary responsibility for implementing the Tanner Act,[4] which provides for identification and regulation of toxic air contaminants by airborne toxic control measures. (Health & Saf. Code, §§ 39650, 39655; *Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 412 [261 Cal.Rptr. 384, 777 P.2d 157].) The State Air Resources Board has listed asbestos as a toxic air contaminant for which there is insufficient scientific evidence to support identification of any safe level of exposure for human health. (Cal. Code Regs., tit. 17, § 93000; *Coalition for Reasonable Regulation of Naturally Occurring Substances v. California Air Resources Bd.* (2004) 122 Cal.App.4th 1249, 1253 [19 Cal.Rptr.3d 635] (*Coalition*).) We are confident that asbestos is a "pollutant" within the meaning of the exclusion.

2. *Causal mechanism.* As to the damage to the Association's property which necessitated remediation efforts, these were caused by a "release" of asbestos into the air. "Release" is a defined mechanism within the terms of

---

[2] Title 33 United States Code section 1251 et seq.

[3] Title 42 United States Code section 7401 et seq.

[4] Health and Safety Code section 39650 et seq.

the pollution exclusion. When asbestos is disturbed by construction and related activities, the result is commonly referred to as a "release" of asbestos, and this description occurs frequently in opinions and statutes. (See, e.g., *Saller v. Crown Cork & Seal Co., Inc.* (2010) 187 Cal.App.4th 1220, 1228 [115 Cal.Rptr.3d 151] ["[p]roducts that incorporate asbestos release asbestos into the air if they are handled in a manner that disturbs them because this causes the asbestos to become airborne"]; *Coalition, supra,* 122 Cal.App.4th at p. 1264 [" '[d]isturbances of serpentine or asbestos-containing ultramafic rock can cause asbestos fibers to be released into the ambient air when disturbed . . .' "]; Lab. Code, § 6501.8, subd. (a) [defining " 'asbestos-related work' " as "any activity which by disturbing asbestos-containing construction materials may release asbestos fibers into the air"]; Health & Saf. Code, § 25926, subd. (d) [legislative finding that "[w]hen [asbestos] materials deteriorate or become loose, damaged, or friable, they release asbestos fibers into the ambient air"].)

b. *The Association's assertions are not compelling.* Having established that asbestos is a pollutant and it caused harm within one of the enumerated methods of dissemination, we now turn to the Association's assertion that the pollution exclusion did not apply in this case. It advances two primary arguments: First, the single, unintentional, localized asbestos release was a mere ordinary act of negligence and thus not environmental pollution under *MacKinnon.* Second, the release was not a dispersal such that a layperson reasonably would understand it to constitute environmental pollution subject to the exclusion.

1. *Ordinary act of negligence.* It is true that *MacKinnon* distinguished environmental pollution from "ordinary acts of negligence involving harmful substances," and held it was "far from clear" that "injuries arising from the normal, though negligent, residential application of pesticides, would be commonly thought of as pollution. . . . The normal application of pesticides around an apartment building in order to kill yellow jackets would not comport with the common understanding of the word 'pollute.' " (*MacKinnon, supra,* 31 Cal.4th at pp. 653–654.)

The Association's argument gains no traction because what happened here with the scraping and removal of acoustical "popcorn" ceilings containing asbestos cannot be lumped in with the "ordinary" act of spraying pesticides or the "normal application" of pesticides. To begin with, the Association was aware that the ceiling material contained some asbestos, as was the contractor.[5] More to the point, whereas a homeowner can purchase and apply

---

[5] Jacob Hussary, owner of Cal Coast, testified to his understanding that the content level of asbestos was below 1 percent, an acceptable level that would not trigger the need for special treatment in its removal. In litigation between Cal Coast and the Association, Cal Coast alleged

pesticides in a residential setting to kill insects, it is highly unlikely that a homeowner, on his or her own, could remove acoustical "popcorn" ceilings containing asbestos without violating a myriad of laws, and with good reason. Any renovation or demolition activity which disturbs asbestos-containing construction materials is stringently regulated. Thus, any employer or contractor who engages in asbestos-related work[6] which involves 100 square feet or more of surface area of asbestos-containing material,[7] must register with the Division of Occupational Safety and Health (Cal-OSHA). (Lab. Code, §§ 6302, subd. (d), 6501.5.) If the employer is a contractor, the application for registration must demonstrate that the contractor is certified to perform such work, as demonstrated by passing an asbestos certification exam given by the Contractors' State License Board. (*Id.*, § 6501.5, subd. (a); Bus. & Prof. Code, § 7058.5, subd. (a).) Notice must be given to Cal-OSHA of each job or phase of work, including the name of a certified supervisor "with sufficient experience and authority who shall be responsible for the asbestos-related work at that job." (Lab. Code, § 6501.5, subd. (b)(4).) And there must be a posting, readable at 20 feet, at the location where the work is being conducted. (*Id.*, subd. (c).)

Any contractor who engages in asbestos-related work without the above certification is guilty of a misdemeanor, with penalties of between $1,000 and $3,000 for the first offense and possible revocation or suspension of the contractor's license. (Bus. & Prof. Code, § 7028.1, subd. (a).) The same sanctions apply when a contractor hires an uncertified person to perform asbestos-related work. (*Id.*, § 7118.5.)

In this region, the District heavily regulates the demolition and renovation of buildings and structures containing asbestos. District regulation 11, rule 2, entitled "Asbestos Demolition, Renovation and Manufacturing," governs all aspects of demolition, renovation, and removal of asbestos. For a project involving removal of 100 square feet/linear feet or greater of regulated asbestos containing material (RACM), the District must be notified at least 10 working days before commencing work. (Dist. reg. 11, rule 11-2-401.3.) The notice requirements are detailed, including the procedures used to identify the

---

that it relied on the Association's assurance that testing had been conducted and a report confirming a safe level of asbestos would be forthcoming. Finally, Forensic Analytical indicated, based on input from a representative of the Association, that the Association informed Cal Coast about the asbestos content of the ceiling, and directed that it was the contractor's responsibility to secure a reliable report before proceeding.

[6] " '[A]sbestos-related work' " is "any activity which by disturbing asbestos-containing construction materials may release asbestos fibers into the air and which is not related to its manufacture, the mining or excavation of asbestos-bearing ore or materials, or the installation or repair of automotive materials containing asbestos." (Lab. Code, § 6501.8, subd. (a).)

[7] " '[A]sbestos containing construction material' " is "any manufactured construction material that contains more than one-tenth of 1 percent asbestos by weight." (Lab. Code, § 6501.8, subd. (b).)

RACM, a description of the planned demolition or renovation methods, and work practices and engineering controls. (*Ibid.*) Prior to undertaking any demolition or renovation, a survey must be performed by a person certified by Cal-OSHA to determine the presence of RACM. (Dist. reg. 11, rule 11-2-303.8.) And finally, detailed procedures are set forth for the renovation or removal of any building elements containing any amount of RACM, including requirements for wetting exposed RACM, or alternatively capturing emissions from RACM through a special exhaust, ventilation and collection system, as well as a protocol for containing removed RACM. (Dist. reg. 11, rule 11-2-303 et seq.)

For all these reasons, we reject the Association's "ordinary act of negligence" argument.

Related to this line of reasoning is the notion that the pollution exclusion applies only to industrial activity and incidents, and lacks plausibility in a residential context. But of course the activity here was a commercial operation, namely the removal of asbestos-containing ceiling material by a licensed general contractor, work that is tightly regulated and entails notification, and highly technical protocols for asbestos removal, containment and waste disposal. In essence, a commercial contracting process was badly botched in a large residential compound. The residential/industrial distinction has little significance here. The activity bears no resemblance to the absurd scenarios ticked off in *MacKinnon* that would fit a broadly and literally interpreted pollution exclusion, for example, a hypothetical allergic reaction to pool chlorine, or an injury or allergic reaction caused by the eyedropper application of iodine onto a cut. (*MacKinnon, supra*, 31 Cal.4th at p. 650.)

2. *Widespread versus localized dispersal and harm.* The Association is insistent that the "[r]elease of asbestos in a single condominium building is not [a] 'dispersal' such that a reasonable layperson insured would understand it to be 'environmental pollution' subject to the exclusion." We take issue with the argument and the conclusion.

Our Supreme Court recently summarized its analysis of the operative mechanisms of dissemination detailed in the *MacKinnon* pollution exclusion this way: "We noted [in *MacKinnon*] that the terms 'release' and 'escape' in a pollution exclusion 'connote some sort of freedom from containment' [citation]; 'the word "dispersal," when in conjunction with "pollutant," is commonly used to describe the spreading of pollution widely enough to cause its dissipation and dilution' [citation]; and in the pesticide context 'discharge' was most commonly used 'to describe pesticide runoff behaving as a traditional environmental pollutant [citation].' " (*State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1020 [90 Cal.Rptr.3d 1, 201 P.3d 1147].)

■ Contrary to the thrust of the Association's argument, the emission of asbestos by scraping the acoustic ceiling tiles *does not implicate a dispersal mechanism* whereby a contaminant becomes dissipated and diluted when widely dispersed. Rather, what is involved is the *release* of asbestos fibers into the air. As the District explains, "There is no safe level of exposure to asbestos; therefore, all exposure to asbestos should be avoided. [¶] . . . [¶] . . . In order for asbestos to be a health hazard, it must be released from the product into the air people breathe." (<http://www.baaqmd.gov/Divisions/Compliance-and-Enforcement/Asbestos-Programs/Asbestos-FAQ.aspx> [as of Aug. 17, 2011].) A reasonable insured would understand the exclusion for "release" of pollutants to apply where, as here, the scraping of acoustical ceiling material freed asbestos fibers from containment; they became airborne and spread throughout building 300, including its corridors, stairwells, in residential units, inside the HVAC system, and onto the exterior grounds, notably the rock gardens, at the entrance of the building, on sidewalks, in bushes and grass in front of the building and in parking lots and a private street; and upon release, the asbestos fibers instantly became a health hazard. As the *MacKinnon* court acknowledged, its use of the terms " 'commonly thought of as pollution,' " and " 'environmental pollution' " were "not paragons of precision, and further clarification [might] be required. . . . [T]he 'common understanding of the word "pollute" indicates that it is something creating impurity, something objectionable and unwanted.' " (*MacKinnon, supra*, 31 Cal.4th at p. 654.) We conclude that unlike the normal application of pesticides in *MacKinnon*, the release of asbestos here would comport with the common understanding of the word "pollute."

As well, the court in *Golden Eagle* made it clear that "there need not be 'wholesale environmental degradation, such as occurred at, for example, Love Canal, or the Stringfellow Acid Pits,' to constitute [environmental] pollution." (*Golden Eagle, supra*, 127 Cal.App.4th at p. 486; see also *Miller, supra*, 159 Cal.App.4th at p. 516 [noting that there was no indication in *MacKinnon* that the high court intended such a limitation].)

■ On a related note, the Association is adamant that the exclusion does not apply to a "one-time" release of asbestos fibers. The same argument was made in *Miller, supra*, 159 Cal.App.4th 501. There, a worker repairing a sewer line sustained serious injuries when he came into contact with wastewaters containing methylene chloride that were discharged by a furniture stripping company into an industrial waste floor sump that was tied into the public sewer system. The record did not show whether the discharge was a single event or a series of wrongful acts. However, the insured argued that the pollution exclusion was not intended to preclude coverage of "one-time,

ordinary acts of negligence." (*Id.* at p. 515.) The reviewing court rejected this assertion, explaining that the key point under a *MacKinnon* analysis is whether the act in question is commonly thought of as environmental pollution. Thus, even if the accident consisted of a *one-time* negligent release of methylene chloride, the pollution exclusion would preclude coverage because permitting the chemical to be released into a public sewer was an act of environmental pollution. (*Ibid.*) *Miller* is persuasive. To establish bright-line rules as to what constitutes "environmental pollution" makes no sense: A one-time event can be a polluting event if it creates " 'impurity, something objectionable and unwanted.' " (*MacKinnon, supra,* 31 Cal.4th at p. 654.) To reiterate: The release of asbestos from a product into the air people breathe constitutes a health hazard for which no level of exposure is safe. The work here apparently occurred over several days and resulted in the sufficient release of asbestos fibers into the air to contaminate the building complex and the adjacent outside areas, constituting environmental pollution.

c. *Failure to include specific asbestos exclusion.* The Association also presses that State Farm's failure to include an industry-standard asbestos exclusion policy endorsement created a disputed material fact as to whether the parties intended to exclude asbestos claims and specifically whether a reasonable insured would have understood a generalized pollution exclusion to bar asbestos-related claims. *Golden Eagle, supra,* 127 Cal.App.4th 480 is helpful. The claimant argued that because the policy included a specific asbestos exclusion endorsement, and silica was another natural product, like asbestos, a reasonable insured would understand that the pollution exclusion did not pertain to claims for exposure to silica because there was no comparable explicit endorsement. Rejecting that argument, the court explained that in view of widespread asbestos litigation, it would not be surprising for an insurer looking to bar coverage for asbestos claims to include an explicit provision making that exclusion clear. However, the prudence in including a specific provision governing asbestos claims did not "restrict the scope of the pollution exclusion." (*Id.* at p. 488.) Similarly, notwithstanding that an asbestos endorsement was available but not incorporated into the policy, the scope of the pollution exclusion remains the same.[8]

---

[8] The Association cites no California authority that suggests that the absence of a specific asbestos endorsement raises a triable issue about intent to exclude asbestos claims. It does refer to an Ohio opinion—*Owens-Corning Fiberglas v. Allstate Ins.* (1993) 74 Ohio Misc.2d 144, 156–157 [660 N.E.2d 746]—a case in which earlier policies had sometimes limited or expressly excluded coverage for asbestos-related claims. This factual history, combined with the industry practice of using asbestos exclusionary clauses over the years, supported an inference that the parties to the current policy, which lacked these limitations, intended to cover such claims despite the standard pollution exclusion. There is no comparable history here and thus this out-of-state authority is inapposite.

## III. DISPOSITION

The release of asbestos in this case constituted environmental pollution within the meaning of the pollution exclusion. Judgment was properly entered in favor of State Farm and hence we affirm that judgment.

Ruvolo, P. J., and Rivera, J., concurred.